1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11   THERMOLIFE INTERNATIONAL, LLC, <br><br> 12                                   Plaintiff, <br><br> 13   v. <br><br> 14 <br> 15   MYOGENIX CORP.; GNC CORPORATION; GENERAL <br> 16   NUTRITION CENTERS, INC.; and GENERAL NUTRITION <br> 17   CORPORATION, <br><br> 18                                   Defendants. <br> 19 | Case No.:  13cv651 JLS (MDD) (LEAD CASE) <br><br> **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY** <br><br> (ECF No. 132) |

20

21          Presently before the Court is Defendants' Motion for Summary Judgment of

22   Invalidity.  (ECF No. 132.)  Also before the Court are plaintiff Thermolife International,

23   LLC's Opposition to Defendants' Summary Judgment on the Grounds of Invalidity

24   (Opposition), (ECF No. 135), and Defendants' Reply in Support of their Motion for

25   Summary Judgment of Invalidity, (ECF No. 136).

26          Due largely to the complexity of the technological field, and correspondingly, the

27   prior art and patents themselves, Defendants have failed to meet their burden of showing

28   that the undisputed facts in this case render the asserted patent claims obvious or

anticipated.  Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment with regard to obviousness and anticipation of the asserted patents.

In addition, there is a genuine dispute of material fact over whether the specification of U.S. Patent No. 6,117,872 sufficiently enables a person of ordinary skill in the art to make and use the claimed invention by credibly setting forth its utility.  Consequently, the Court **DENIES** Defendants' Motion for Summary Judgment with regard to lack of enablement.

## BACKGROUND

Thermolife International, LLC (Plaintiff) asserts claims from four patents in this proceeding: U.S. Patent Nos. 6,117,872 (the '872 Patent), 5,891,459 (the '459 Patent), 7,452,916 (the '916 Patent), and 6,646,006 (the '006 Patent).  (Am. Compl., ECF No. 122.)  Stanford University owns these patents, and Plaintiff exclusively licenses them. (*Id.*, at 2.)[1]

Broadly speaking, the asserted patents concern administering the amino acids arginine and lysine in combination with antioxidants and other ingredients to enhance vascular function and physical performance.  (Mot., ECF No. 132-1, at 5.)  According to the asserted patents, this is achieved by causing the arteries to dilate, allowing greater blood flow and, ultimately, enhanced physical performance.  First, the subject ingests arginine or lysine.  Those amino acids are then converted in the endothelial cells lining the arteries into nitric oxide.  (Mot., 132-1, at 6.)  The release of nitric oxide in the arteries then causes the arteries to dilate, allowing enhanced performance.

Nitric oxide is derived directly from L-arginine, one form of the amino acid arginine, such that L-arginine is the direct precursor to nitric oxide.  (Volek Expert Report, Pl. Ex. 9, ECF No. 135-11, at 19.)  Nitric oxide is easily converted via oxidation into nitrate, or $NO2-$, and nitrite, or $NO3-$.  (*Id.* at 18.)  Both nitrate and nitrite do not have relaxing

---

[1] For ease of reference, page citations to docketed materials refer to the electronically stamped CM/ECF page number.

properties, and thus do not dilate the arteries.  (*Id.*)  Antioxidants prevent oxidation of nitric oxide.  (*Id.*)

According to Plaintiffs, in 1993, scientists in this field knew much "about the biology of the L-arginine[-]nitric oxide pathway . . . , [but] little was known about its disturbances in vascular disease."  (Opp'n, ECF No. 135, at 8.)  While scientists knew that nitric oxide derived from L-arginine was "important in the healthy blood vessel," they did not know that supplementing L-arginine could reverse vascular disease.  (*Id.*)  For several years, there was scientific debate about what caused endothelial dysfunction, with the "majority of people skilled in the art" attributing the problem to oxidative degradation, which would not be improved by L-arginine supplementation, as opposed to impaired biosynthesis, which would be improved.  (*Id.*)

Dr. John P. Cooke is one of the inventors for all four of the asserted patents. According to Plaintiff's expert, Dr. Rainer Böger, "Dr. Cooke's work laid the foundation for the last two decades of research in the field of arginine supplementation, and remains the seminal body of work upon which ongoing research and product formulation continue to be based."  (*Id.* at 8.)

Plaintiff sued dozens of defendants alleging infringement of these patents.  Pursuant to Federal Rule of Civil Procedure 42, the Court ordered the cases consolidated for certain pretrial purposes, including claim construction and invalidity proceedings.  (*See* ECF No. 22.)  The Court held a claim construction hearing on November 12, 2014, and on December 2, 2014, issued its Order on Claim Construction.  (ECF No. 109.)  The Defendants on July 29, 2015, moved for summary judgment, arguing the asserted patents are invalid.  (Mot., ECF No. 132.)

The Court held a hearing on Defendants' Motion (Motion Hearing) on November 12, 2015.

The parties agree that a person of ordinary skill in the art is someone with a "Ph.D. in biochemistry, pharmacology, nutrition chemistry, kinesiology, or the like, and at least two years of post-doctoral research or clinical work in physiology or biochemistry, or

alternatively with an M.D. and two years [of] work experience relating to supplementation and formulation."  (Mot., ECF No. 132-1, at 14.; Böger Responsive Expert Report, Def. Ex. 15, ECF No. 132-18, at 6.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact.  *Id.*  When a plaintiff seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial.  *Celotex*, 477 U.S. at 324.  This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "by her own

affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

## ANALYSIS

### I.    The '872 Patent

Defendants argue the '872 Patent is invalid because, based on the prior art at the time of invention, the claimed invention would have been obvious to a person of ordinary skill in the art. Defendants also contend that the '872 Patent's specification does not credibly disclose the utility of the claimed invention, and is therefore invalid because it does not enable a person of ordinary skill in the art to make and use the invention.

As will be shown below, by raising both of these arguments, both sides are advancing a pair of seemingly contradictory positions. Defendants argue both that the invention of the '872 Patent was obvious at the time of the invention and, for their enablement argument, that the utility of the patent would not have been obvious—or even credible—to a person of ordinary skill in the art. Put simply, Defendants suggest a skilled artisan would have thought the invention obvious, but would not have believed the invention worked. Conversely, Plaintiff argues that the invention of the '872 Patent would *not* be obvious to a person of ordinary skill in the art at the time of the invention, but that a skilled artisan would have nonetheless read the patent and found it obvious—or at least credible—that the invention worked as stated. Simplifying again, Plaintiffs contend a skilled artisan would not think the invention was obvious, but would not doubt that it worked once he saw this patent's specification.

There may be some explanation, relying on the presumption of validity and correspondingly high evidentiary standard, by which Plaintiff may convince a trier of fact that the '872 Patent is simultaneously sufficiently enabled and nonobvious. It may also be that the claimed invention was not an obvious combination of known elements, but that

- 5 -

once combined, a skilled artisan reading the specification would have a moment of epiphany regarding the invention's functionality, and would therefore not doubt its utility. In the end, whether an invention was obvious and then, once described, whether the invention was credible are not the same question.

It is just as likely that the '872 Patent is either obvious or not enabled, such that the patent should not have issued and is therefore invalid on one but not both of these bases. The Defendants urge the Court to grant summary judgment of invalidity based on either of these sufficient bases, and to determine as a matter of law that the '872 Patent is either obvious or not enabled.  Presenting the Court with this choice, however, shows why the Defendants' Motion must be denied: the factual record is not exact about the scope and content of the prior art, so it is not clear whether the Court should find the patent obvious *or* not enabled, although it seems fairly certain that it would not be both.

To some extent, these arguments are two sides of the same coin.  Certainly the Defendants are allowed to advance both arguments, but the fact that both arguments have merit shows why the Court cannot simply pick one in this procedural context.  Summary judgment requires the Court to find an absence of genuine dispute of material fact.  The Court cannot say Plaintiff loses because the coin will either come up heads or tails.  The Court must call heads or tails, which it cannot do at this stage.  Because there are disputes of fact, summary judgment must be denied.

### A.   *Obviousness*

Patent claims are invalid if they cover only subject matter that would have been obvious at the time of invention to a person of ordinary skill in the art to which the patent pertains.  35 U.S.C. § 103(a) (pre-America Invents Act version).[2]  This requirement ensures that "the results of ordinary innovation are not the subject of exclusive rights under the

---

[2] The statutory framework for patent law, including § 103, was amended by the Leahy–Smith America Invents Act ("AIA"), Pub.L. No. 112–29, § 3(c), 125 Stat. 284, 287–88 (2011).  For pertinent purposes here, the pre-AIA statutory framework applies to patents for which the application was filed before March 16, 2013.  *Id.* at 293; *In re Giannelli*, 739 F.3d 1375, 1376 n.1 (Fed. Cir. 2014).  All of the applications for the asserted patents in this case were filed before that date.

patent laws." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007).  If the exclusivity of a patent were allowed for ordinary advances "in the normal course, . . . patents might stifle, rather than promote, the progress of useful arts."  *Id.*

For a claimed invention to be nonobvious, it does not need to contain an element or claim limitation that appears nowhere in the prior art.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–19 (2007).  Rather, "claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."  *Id.*  Unlike anticipation, covered by 35 U.S.C. § 102, courts determine whether a patent claim is obvious under 35 U.S.C. § 103 when no single reference discloses each aspect or limitation of the challenged claim. The obviousness inquiry, thus, often involves combining multiple prior art references— often printed publications and other patents—and comparing them to the claim.  35 U.S.C. § 102 & 103; *see also KSR*, 550 U.S. at 415–16.  A patent claim is invalid under § 103 if, as drafted and construed, it extends to subject matter that is obvious.  *KSR*, 550 U.S. at 419. When a claim combines "familiar elements according to known methods," and as a result "yield[s] predictable results," the claim is typically obvious.  *Id.* at 416; *Anderson's–Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 60–62 (1969) (holding that an invention combining a radiant heat burner and a paving machine into one device did nothing differently than if the two were used in sequence, and was therefore obvious).

When the invention solves a problem in a field in which "there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp."  *KSR Int'l Co.*, 550 U.S. at 421.  When the results of these known options is the "anticipated success," the subject matter is typically obvious.  *Id.*

Patent invalidity is ultimately a question of law, but is predicated on factual inquiries.  *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966).  Those factual inquiries are (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the pertinent art, and (4) objective evidence of nonobviousness.  *Id.*; *Dome Patent L.P. v. Lee*, 799 F.3d 1372, 1379

- 7 -

(Fed. Cir. 2015); *see also KSR*, 550 U.S. at 427 (noting that summary judgment of obviousness was appropriate because the content of the prior art, the scope of the patent claim, and level of ordinary skill in the art were "not in material dispute").

When all elements may be found in various prior art references, the fact finder must consider whether a person of ordinary skill in the art would have a reason to combine those references and the elements of the invention that they contain, and whether the skilled artisan would have a "reasonable expectation of success" in combining those elements. *Dome Patent L.P. v. Lee*, 799 F.3d at 1380 (citing *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006)). One way a party challenging a patent's validity may show this reason or motivation is by identifying some "teaching, suggestion, or motivation to combine known elements" in the relevant art. *See KSR Int'l Co.*, 550 U.S. at 418. In other circumstances, however, the reason to combine references will lie in "interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by" a skilled artisan. *Id.* at 417–18.

In some instances, the prior art will "teach away" from certain innovations, or, in other words, suggest that a certain combination or technique is unlikely to lead to a desired result. *See KSR*, 550 U.S. at 416. When the prior art teaches away from the claimed subject matter, the teaching away indicates the claimed subject matter is not obvious. *Id.* (citing *United States v. Adams*, 383 U.S. 39 (1966)) ("The fact that the elements worked together in an unexpected and fruitful manner supported the conclusion that [the inventor's] design was not obvious to those skilled in the art.").

Courts give issued patents a "strong presumption of validity." *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999); 28 U.S.C. § 282(a) ("Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims."). To overcome this presumption, the party challenging a patent must prove invalidity by clear and convincing evidence. *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1354 (Fed. Cir. 2015). This burden is

- 8 -

"especially difficult" when the party challenging validity relies "on prior art that was before the patent examiner during prosecution." *Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004) (citing *Al–Site Corp. v. VSI Int'l Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999)); *see also Hoffmann-La Roche Inc. v. Apotex Inc.*, 496 F. App'x 46, 56 (Fed. Cir. 2012) ("[T]he finding that the examiner considered and rejected the asserted prior art weighs strongly against a preliminary finding that the patented subject matter is likely to be ruled obvious as a matter of law.").

The ultimate burden of proof is clear and convincing evidence regardless of whether the references relied upon for invalidity were presented to the patent examiner; however, art not previously considered by the examiner carries more persuasive weight toward obviousness than do references considered by the examiner that were ultimately deemed not to render the invention obvious. *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012) ("[I]t may be harder to meet the clear and convincing burden when the invalidity contention is based upon the same argument on the same reference that the PTO already considered.").

Turning to the patent in suit, at issue in the '872 Patent are claims 1, 4, 5, 7, 8, 9, 10, and 12. Claims 4 and 5 depend from independent claim 1, and claims 8, 9, and 10 depend from independent claim 7. Claim 12 is an independent claim.

To prove obviousness, the Defendants rely on the combination of the '459 Patent, which is also asserted in this litigation but predates the '872 Patent, and is titled "Enhancement of Vascular Function by Modulation of Endogenous Nitric Oxide Production or Activity," and the *Ceremuzynski* reference, titled "Effect of Supplemental Oral L-Arginine on Exercise Capacity in Patients with Stable Angina Pectoris," which was published in the American Journal of Cardiology on August 1, 1997.[3] (Mot., ECF No. 132-1, at 18.) Plaintiff contends that Defendants have not identified evidence suggesting a

---

[3] Although this was subject was contended at Dr. Böger's deposition, (Böger Dep., Def. Ex. 7, ECF No. 132-9, at 22–23), Plaintiff does not presently argue these references are not appropriately considered prior art, (*See* Pl. Opp'n, ECF No. 135, at 8–14).

- 9 -

person of ordinary skill in the art would have had a reason to combine these references. (Opp'n, ECF No. 135, at 13–14.)   Plaintiff also points out that the art described in *Ceremuzynski* was "well known" at the time of patent prosecution and that *Ceremuzynski* was cited by references the patent examiner actually considered.   (Opp'n, ECF No. 135, at 8–9.)   Thus, Plaintiff argues, the relevant portions of this reference include no substantive information the patent examiner did not already consider, and are entitled to little weight in proving obviousness.   (*Id.*)

> (i)   *Combination of* Ceremuzynski *and the '459 Patent*

The question of whether a skilled artisan would have a motivation to combine prior art references is generally a question of fact, but motivation to combine may "nonetheless be addressed on summary judgment or JMOL in appropriate circumstances."   *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238–39 (Fed. Cir. 2010) (citing *KSR*, 550 U.S. at 427). In some cases, the motivation to combine may be apparent based on "logic, judgment, and common sense, in lieu of expert testimony."   *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1239 (Fed. Cir. 2010).   However, such cases typically involve "technology [that is] 'easily understandable.'"   *Id.*   By contrast, "'expert testimony regarding matters beyond the comprehension of laypersons is sometimes essential,' particularly in cases involving complex technology."   *Id.* at 1240 n.5; *see also Allergan, Inc. v. Barr Labs., Inc.*, 501 F. App'x 965, 972 (Fed. Cir. 2013) (holding in a case involving a drug used to reduce intraocular pressure in people with ocular hypertension and glaucoma that "the district court did not err in finding that common sense and logic were not sufficiently illuminating in this case to carry [accused infringers'] burden of proving obviousness"); *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012) ("[T]he technology at issue here[, a method of treating tissue damage,] is not the type of technology where common sense would provide the motivation to combine these references.").

Plaintiff argues that Defendants have not identified a reason or motivation for a skilled artisan to combine the *Ceremuzynski* reference and the '459 Patent, and have therefore failed to meet their burden of identifying evidence that, if uncontroverted, would

entitle Defendants to judgment as a matter of law.  (Opp'n, ECF No. 135, at 13.)  Although it is no longer the case that parties seeking to invalidate patent claims based on obviousness must always identify a specific teaching, suggestion, or motivation to combine the relevant references, it is still important for that party to explain why a skilled artisan would combine the relevant elements of the patent at the time of invention.  *See Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356–57 (Fed. Cir. 2007).

Defendants counter that "the ultimate inference as to the existence of a motivation to combine references *may* boil down to a question of common sense."  (Rep., ECF No. 136, at 5 (citing *Wyers*, 616 F.3d at 1240) (emphasis the Court's).)

In this case, however, the Court cannot say that the knowledge and motivations of specialized medical doctors or post-doctoral researchers falls easily within the realm of common sense.  In contrast to this case, the *Wyers* court noted that the case in which the Federal Circuit had previously endorsed the "common sense" approach was one where the "technology was 'easily understandable.'"  *Wyers*, 616 F.3d at 1240.  It then concluded that the common sense approach may be useful "in appropriate cases."  *Id.*  This is not an appropriate case.[4]

Given the high level of skill in the art, the instant case is one in which expert testimony is "critical" to establish "the existence (or lack thereof) of a motivation to combine references."  *Wyers*, 616 F.3d at 1240 n.5.  As Plaintiff notes in its Opposition, there is an absence of evidence on this point: "Defendants could not draw out such a reason [to combine references] from Dr. Boger, Dr. Cooke, or Dr. Maxwell during their lengthy depositions."  (Opp'n, ECF No. 135, at 13.)  In light of the lack of evidence on this point, the Court cannot conclude that a skilled artisan would have had a reason to combine the two references.

---

[4] Unlike this case, in *Wyers*, the district court instructed the jury that the relevant skilled artisan was "a person of ordinary skill in the field of locksmithing."  *Wyers*, 616 F.3d at 1238.

- 11 -

At the Motion Hearing, Defendants suggested the question courts should ask regarding combinations of prior art references after *KSR* is what the collective knowledge of the relevant field is.  Defendants asked the Court to consider the small scientific community that worked in arginine supplementation, and to infer from the smallness of that community that a skilled artisan would have known about both references, and thus would have thought to combine them.  It is true that the Supreme Court in *KSR* rejected the Federal Circuit's "rigid" application of the teaching, suggestion, or motivation test and replaced it with "an expansive and flexible approach."  *KSR*, 550 U.S. at 415.  Although flexible, the *KSR* approach is not amorphous.  Where common sense does not hold the answer—and here it does not—Defendants must provide some evidence that a skilled artisan would think to combine these references.  That reason to combine does not necessarily need to come in the form of a specific teaching, suggestion, or motivation, but some evidence is still required.[5]

Defendants' suggestion about this purportedly tight-knit scientific community may in fact prove true, and they will have the opportunity to present evidence on this point to a trier of fact; however, at this stage, they have not identified evidence in the record that a skilled artisan would combine these references, and the technology does not involve matters of common sense.

Accordingly, Defendants have not met their burden of identifying evidence that the invention claimed in the '872 Patent would be obvious to a person of ordinary skill in the relevant art.

(ii)     *Scope of Prior Art and Difference From Claims*

---

[5] Defendants also directed the Court to *The Tawnsaura Group, LLC v. Maximum Human Performance, LLC*, Case No. 12-CV-07189 SJO (AGRx), 2014 WL 10473254 (C.D. Cal. July 14, 2014).  *Tawnsaura* involved surprisingly similar facts to the instant case, some common defendants, and many of the same attorneys on either side.  *Id.*  In that case the court held the asserted patents were invalid for obviousness, among other reasons.  *Id.* at *3.  Notably, the defendants' expert in *Tawnsaura* "describe[d] a number of reasons a person of ordinary skill in the art would have combined the teachings of [the prior art references], none of which [we]re rebutted by the Plaintiff."  *Id.* at *10.  The same cannot be said here.

The content of the prior art and the differences between the patented invention and the prior art are questions of fact. *Graham*, 383 U.S. at 17. Even if Defendants were not required to identify evidence of a reason to combine the references upon which they rely, there would still be a genuine dispute of material fact with regard to the scope and content of the prior art, as well as how that art compares to the invention of the '872 Patent.

Although Plaintiff does not explain clearly in its brief why the '872 Patent claims would not be obvious in light of the combination of *Ceremuzynski* and the '459 Patent, Plaintiff argues that each reference individually falls short of making the '872 Patent obvious. Plaintiff contends, first, that *Ceremuzynski* discloses increasing exercise capacity only in subjects with healed myocardial infarctions, whereas the '872 Patent covers an increase in exercise capacity more generally; second, that the '459 Patent focuses on improving vascular nitric oxide activity, whereas the '872 Patent focuses on improving exercise and athletic performance, aerobic capacity, and muscular output; and, finally, that the '872 Patent involves a particular supplementation regimen that is not obvious in light of *Ceremuzynski*. (Opp'n, ECF No. 135, at 12.)

Although a person of ordinary skill in the art would find L-arginine supplementation for the purpose of improving physical performance obvious when viewing *Ceremuzynski* and the '459 Patent together, it is uncertain whether a skilled artisan would find the claimed supplementation regimen obvious. This uncertainty is a dispute of fact that precludes summary judgment of invalidity.

(a)   Enhanced Performance

The preamble to independent claim 1 recites, "A method for enhancing physical performance of a mammal prior to said physical performance, . . ." (ECF No. 132-4, at 15.) The parties agree that "physical performance" in the '872 Patent means "aerobic, exercise, or athletic performance," and the Court construed this claim to require that this "method be practiced with an intent to enhance physical performance." (ECF No. 109, at 7 n.3, 21.)

- 13 -

Plaintiff argues the portions of *Ceremuzynski* upon which Defendants rely involve using exercise to elicit and measure "symptoms of people with coronary artery disease," specifically measuring the differences in those symptoms after being treated with L-arginine.  (Opp'n, ECF No. 135, at 10.)  Plaintiff contrasts this with exercise described in the '872 Patent, which Plaintiff says pertains to aerobic capacity and causing vasodilation of vessels associated with skeletal muscles.  (*Id.*)  Put simply, Plaintiff contends that increasing "exercise capacity" in *Ceremuzynski* is not the same concept as "enhancing physical performance" in the '872 Patent.  The Court disagrees.

Although the invention of the '872 Patent claims something broader than the "exercise capacity" disclosed in *Ceremuzynski*, increased "exercise capacity" nonetheless fits within "enhancing physical performance."  Thus, the element of enhanced exercise capacity and physical performance resulting from taking L-arginine would be obvious to a person of skill in the art reviewing the *Ceremuzynski* reference and the '459 Patent.

It is true that the '872 Patent covers enhanced exercise capacity both for the sick, as disclosed in *Ceremuzynski*, and the healthy, which is not disclosed in *Ceremuzynski*. Plaintiff parses this claim limitation, arguing that arginine supplementation for healthy individuals would not be obvious in light of arginine treatment used to help those recovering from myocardial infarctions, but the invention of the '872 Patent is not so limited.   The invention involves physical performance in general, which occurs in *Ceremuzynski* by exercising the unhealthy individuals.  Further, assuming a skilled artisan would combine these references—a proposition for which Defendants have not identified any supporting evidence—the '459 Patent discloses that "enhancement of NO synthesis could also improve exercise capacity in normal individuals and those with vascular disease."  ('459 Patent, Def. Ex. 4, ECF No. 132-6, at 14.)  The "enhancing physical performance" claim limitation of the '872 Patent "extends to what is obvious" and, taken alone, would be invalid.  *See KSR*, 550 U.S. at 419.

That, however, is not the only claim limitation in the invention claimed in the '872 Patent.

- 14 -

1

(b)      Supplementation Regimen

2

Next, Plaintiff argues the dosage and supplementation regimen described in the '872

3

Patent are not obvious in light of *Ceremuzynski* and the '459 Patent.  Claims 1, 4, and 5 of

4

the '872 Patent cover dosage "of at least about 60 mg/kg/day within 24 h[ours] of said

5

physical performance."  ('872, Def. Ex. 2, ECF No. 132-4, at 15.)  Claims 7, 8, and 9

6

describe "at least about 2 g per day" within "6 h[ours] prior to said physical performance."

7

(*Id.*)  Claim 10 is more specific, and describes dosage "from about 2 to 12 g per day within

8

24 hours of said exertion."  (*Id.*)  Claim 12 describes "about 2 g per day within 24 h[ours]

9

of said physical performance."  (*Id.*)  The '459 Patent appears to disclose these quantities,

10

so, assuming a skilled artisan would combine these references, the more specific question

11

for obviousness of the '872 Patent pertains to the timing of administering these

12

supplements relative to the physical performance.

13

Plaintiff argues the '872 Patent claims teach and cover a method involving "an acute,

14

single dose of arginine," whereas *Ceremuzynski* concerns "the effect of L-arginine after

15

three days," in other words, a chronic dosing regimen.  (Opp'n, ECF No. 135, at 11.)  The

16

acute regimen was an important part of the '872 Patent's invention, Plaintiff argues, and it

17

is unclear whether the three-day chronic regimen would yield the same results.  (*Id.* at 12.)

18

Plaintiff's expert, Dr. Rainer Böger, stated in his deposition that, given the "very short half-

19

life" of compounds such as nitric oxide, "it makes a big difference whether you do a test

20

of whatever kind within an hour or shorter after dosing or within more than 12 hours or

21

even 24 hours of dosing."  (Böger Dep., Def. Ex. 7, ECF No. 132-9, at 31.)  In essence,

22

Plaintiff contends that, even though the chronic regimen in *Ceremuzynski* describes

23

administering arginine within 24 hours and likely also within 6 hours of exercise, thus

24

overlapping with the '872 Patent, the chronic regimen *Ceremuzynski* describes would not

25

naturally lead a person of ordinary skill in the art to try the acute regimen described in the

26

'872 Patent.  (*See* Opp'n, ECF No. 135, 11–12.)  Instead, Plaintiff argues, *Ceremuzynski*

27

teaches away from this acute regimen by describing the chronic regimen.  (*See* Opp'n, ECF

28

No. 135, 11–12.)

- 15 -

Defendants counter that a skilled artisan would understand *Ceremuzynski* to disclose the acute regimen and, "[w]ith a reasonable expectation of success, a person of ordinary skill in the art would have been able to modify the regimen and develop formulations that could be administered within 6 to 24 hours prior to exercise."  (Rep., ECF No. 136, at 7.)

Defendants face several hurdles in making their case for obviousness on this point. The question is whether a skilled artisan—in this case someone with a medical degree or a Ph.D. in the relevant fields of science and some work experience—would read *Ceremuzynski* combined with the '459 Patent and find the chronic regimen described in the '872 Patent obvious.  Notably, two individuals who appear to possess the minimum qualifications necessary to be people of ordinary skill in this art—the experts in this case— disagree on this very point.  In their Reply brief, Defendants provide only a conclusory statement arguing that *Ceremuzynski* would make the acute supplementation regimen obvious to a skilled artisan, and do not cite record evidence for support.  (Rep., ECF No. 136, at 6–7.)  By contrast, Plaintiff identifies Dr. Böger's deposition testimony in which he states that a skilled artisan in this field would not extrapolate from the chronic dosing scheme in *Ceremuzynski* the acute regimen claimed in the '872 Patent.

Although there is some overlap between *Ceremuzynski* and the '872 Patent regarding the timing in which one would administer L-arginine relative to physical performance or exercise, there is a dispute of fact regarding how a person of ordinary skill in the art would read the overall regimen in *Ceremuzynski* and whether the skilled artisan would deduce from the combination of *Ceremuzynski* and the '459 Patent the acute regimen described in the '872 Patent claims.

As with the motivation to combine references, this is the type of case in which expert testimony is "critical" to establish "certain features in the prior art," *Wyers*, 616 F.3d at 1240 n.5, and on this issue the experts disagree.  Of course, the burden for Plaintiff at this stage is not to prove that Dr. Böger is correct and that Defendants are wrong, but simply to show that there is a dispute of fact, and that the dispute matters to the resolution of this case.

- 16 -

In sum, there is a dispute of fact regarding the degree of difference between the prior art and the claims of the '872 Patent—particularly, the significance of the chronic versus acute regimens to a person of ordinary skill in the art.  Thus, Defendants have not presented uncontroverted evidence that these claim limitations are obvious.

(iii)   *Secondary Considerations*

Objective evidence of nonobviousness, often referrerd to as "secondary considerations" or the "objective indicia of nonobviousness," may rebut a prima facie showing of obviousness.  *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) (citing *Graham*, 383 U.S. at 17–18).  These considerations include commercial success, long felt but unsolved needs, and the failure of others.  *Id.*  To rebut a showing of obviousness, there must be a "nexus" between the invention claimed in the patent and the commercial success or other secondary consideration.  *Id.* at 1311–12.

Responding to Defendants' obviousness argument, Plaintiff contends that arginine-based pre-workout supplements such as those claimed in the '872 Patent have enjoyed "widespread commercial success," so the secondary considerations weigh in favor of nonobviousness.  To support this contention, Plaintiff cites statements in a report by Dr. Böger.  (Opp'n, ECF No. 135, at 14.)  The report also attributes the commercial success to the invention claimed in the '872 Patent.[6]  (*Id.*)

Defendants argue that Plaintiff does not actually link the commercial success to a patent claim, or does not "establish a 'nexus'" between the purported commercial success and the claimed invention.  (Rep., ECF No. 136, at 5.)

---

[6] Specifically, Dr. Böger's Report said:

> For instance, since the late 1990's, there has been widespread commercial success of arginine-based supplements in the pre-workout sports nutrition and cardiovascular health industry, due to the inventions disclosed in the patents. Before this time there was no such market. I understand that some of these products obtained licenses to the Cooke patents, but many did not.

(Böger Report, ECF No. 132-18, at 9.)

- 17 -

If the other issues weighed in favor of finding the '872 Patent obvious as a matter of law, Plaintiff's expert's statement in his report probably would not be enough on its own to stave off summary judgment of obviousness. However, because the Court concludes that Defendants failed to identify evidence that a skilled artisan would combine the references upon which they rely, and because there are disputes of fact regarding the comparison of the prior art to the asserted claims, no rebuttal to obviousness is required, so the Court does not reach the question of the significance of the secondary considerations. *See KSR*, 550 U.S. at 426.

### B.   *Enablement/Utility*

To be patentable, an invention must be useful. 35 U.S.C. § 101. The invention's utility must be specific, substantial, and credible. *See Brenner v. Manson*, 383 U.S. 519, 534–35 (1966). Whether an invention lacks utility is a question of fact. *In re Fisher*, 421 F.3d 1365, 1369 (Fed. Cir. 2005); *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 220 (Fed. Cir. 1983).

Additionally, a patent must enable a person of ordinary skill in the art to make and use the claimed invention without undue experimentation. 35 U.S.C. § 112; *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003). Enablement serves to ensure both adequate disclosure—teaching others to make and use the invention as part of the fundamental quid-pro-quo of the patent system—and to prevent the patentee from owning claims broader than the actual invention. *MagSil Corp. v. Hitachi Global Storage Technologies, Inc.*, 687 F.3d 1377, 1380–81 (Fed. Cir. 2012). If a patent fails to enable, it is invalid. *See In re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1323 (Fed. Cir. 2009). Enablement is a question of law predicated on underlying factual considerations. *Id.*

One of those underlying factual considerations is whether the patent credibly discloses the utility of the claimed invention to a person of ordinary skill in the art. *See id.* at 1323–24. "Enablement is closely related to the requirement for utility" because the claimed invention must actually work, or "be operable," for the patent claiming it to be valid. *Id.* If the patent specification describes only something that does not work, it does

- 18 -

not enable a skilled artisan to make and use the invention.  *See id.*  The utility aspect of the enablement requirement prevents patenting of "vague intimations of general ideas that may or may not be workable," *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997), or "a mere research proposal," *In re '318 Patent*, 583 F.3d at 1324.

Defendants argue the '872 Patent does not enable a person of ordinary skill in the art to make and use the claimed invention because the specification does not sufficiently demonstrate utility.  Defendants cite *In re '318 Patent* for the premise that, "in all but extraordinary circumstances," method of treatment patents require disclosure of experimental data to substantiate the utility of new treatment methods.  (Mot., ECF No. 132-1, at 30.)  Although that is a plausible reading of *In re '318 Patent*, the Court must understand the *In re '318 Patent* case and its bearing on utility and enablement in light of other precedential cases, such as *In re Brana*, 51 F.3d 1560, 1566 (Fed. Cir. 1995), and other persuasive authority, such as the nonprecedential opinion in *Eli Lilly & Co. v. Actavis Elizabeth LLC*, 435 F. App'x 917, 925 (Fed. Cir. 2011).

Method of treatment patents pose the following problem: Skilled artisans may be familiar with the properties of a compound, but because the human body is so complex, knowing the properties of the *compound* does not necessarily mean a skilled artisan can predict *how it will work* when used for treatment.  *Cf. In re '318 Patent*, 583 F.3d at 1324.  Thus, experimental data often form an important part of demonstrating that methods of treatment actually work.

In *Brana* the Court affirmed the general premise that a specification describing an invention that corresponds in scope to the subject matter claimed "*must* be taken as in compliance with the enabling requirement of the first paragraph of § 112 *unless* there is reason to doubt the objective truth of the statements contained therein which must be relied on for enabling support."  *Brana*, 51 F.3d at 1566 (emphasis in original) (quoting *in re Marzocchi*, 439 F.2d 220, 223 (CCPA 1971)).  The Federal Circuit in recent years—since issuing its opinion in *In re '318 Patent*—reaffirmed this notion, albeit in the

- 19 -

nonprecedential *Eli Lilly* opinion.  435 F. App'x at 924–25 (citing this same passage, reversing the district court's grant of summary judgment).

In *Eli Lilly*, the district court found a method of treatment patent invalid because the specification did not disclose experimental data substantiating the utility of the invention. *Id.* at 923.  The Federal Circuit reversed the district court, distinguishing the *In re '318 Patent* case on the basis that in *In re '318 Patent*, there was not "a reasonable correlation between" the compound and the claimed therapeutic use, whereas in *Eli Lilly* there was known correlation between the compound and its therapeutic use.  *Id.* at 925–26.  Thus, to grant summary judgment for failing to enable by demonstrating utility in this case there must be uncontroverted evidence that, at the time of invention, there was no reasonable correlation between the compound and the therapeutic use claimed in the patent.

Taking *In re '318 Patent*, *Brana*, and *Eli Lilly* together, it seems that the first question in the utility and enablement context is not whether data are presented, but whether a skilled artisan, reading the patent at the time of invention, would doubt that the invention actually works—or in other words, would doubt its utility.  Such doubt, if present, would often stem from a lack of knowledge of correlation between the compound and its therapeutic use in the relevant field.  Assuming, therefore, that the skilled artisan would doubt the invention's efficacy, *then* experimental data are required.  Thus, the statement in *In re '318 Patent* that patents claiming new methods of treatment are "[t]ypically . . . supported by test results" indicates simply that it is common for skilled artisans to doubt that new methods of treatment actually work because of the complexity of the human body.  *See* 583 F.3d at 1324.

*In re '318 Patent* is an example of a case where a party challenging the utility of an issued patent established by clear and convincing evidence that a skilled artisan would doubt the utility of the invention such that experimental data were necessary to show that the treatment actually worked.  *Id.* at 1327.  Importantly, however, that case was decided after a bench trial, not on summary judgment.  *Id.* at 1320.  When presented with contradictory evidence about what the person of ordinary skill in the art would have

thought about the invention after reading the specification, and what he or she would have known about the correlation between that compound and that treatment, the court could weigh the evidence and make factual determinations.  *See id.* at 1320.  Tellingly, the inventor in that case had stated that "the utility of the invention could not be inferred from the prior art," and that such a conclusion at the time of invention would have been "baseless," because the earlier studies did not establish a correlation between the compound and the therapeutic use claimed in that patent.  *Id.* at 1325–26.  By contrast, for purposes of the instant Motion, the Court may not resolve factual disputes.

Defendants also cite *Rasmusson v. SmithKline Beecham Corporation* for the proposition that a patent is invalid for lack of enablement when "there is a complete absence of data supporting the statements which set forth the desired results of the claimed invention."  413 F.3d 1318, 1323 (Fed. Cir. 2005).  That statement, however, applies to section 112 rejections during patent prosecution.  *See id.*  Importantly, *Rasmusson* was an appeal from interference proceedings at the U.S. Patent and Trademark Office, rather than an infringement action in a district court.  *Id.* at 1320.  During patent prosecution, the examiner may appropriately ask for "substantiating evidence unless one with ordinary skill in the art would accept the allegations as obviously correct."  *See id.* at 1323.  The Board of Patent Appeals and Interferences ultimately concluded that a skilled artisan would not take as given that the compound at issue could be used for the claimed purpose based on the supporting articles the inventor submitted, and that the invention had not been sufficiently enabled as of a particular filing date.  *Id.* at 1324.  Accordingly, the inventor was not entitled to priority based on the filing date of the non-enabled patent.  *See id.*

As the Federal Circuit clarified in *Eli Lilly*, the *Rasmusson* case does not mean that, after a patent has issued, it is invalid as a matter of law if it does not include substantiating data.  *See* 435 F. App'x at 925 (distinguishing *Rasmusson* and pointing out that the district court in the *Eli Lilly* case had *incorrectly* "accepted the defendants' position that [experimental] data were required to be included in the specification.").

- 21 -

1    Defendants rely mainly on the lack of substantiating data in the '872 Patent in

2    arguing the asserted claims are invalid.  Given the state of the record and the current

3    procedural posture, that lack of data is not enough to merit judgment as a matter of law.

4    The result is not that Plaintiff has proven the '872 Patent credibly discloses the utility of

5    the claimed invention.  It is simply that Defendants have not identified uncontroverted

6    evidence sufficient to overcome the presumption of validity and show by clear and

7    convincing evidence that the '872 Patent *does not* credibly disclose the utility of the

8    invention it claims.

9                    (i)      *Ingesting Lysine to Improve Physical Performance*

10    The invention claimed in the '872 Patent involves administering "at least one amino

11    acid selected [from] the group consisting of arginine and lysine . . . ."  ('872, Def. Ex. 2,

12    ECF No. 132-4, at 15.)  Defendants argue that the asserted claims of the '872 Patent are

13    invalid because they are "completely devoid of any supporting disclosure about lysine."

14    (Mot., ECF No. 132-1, at 32.)  The '872 Patent's specification and the materials cited

15    therein do not address lysine or show that it will improve physical performance, Defendants

16    contend.  (*Id.* at 32.)

17    Of course, for enablement and utility purposes, it would not be enough that lysine

18    ultimately worked as described in the invention.  The hypothesis patented in *In re '318*

19    *Patent* ended up working, but that patent was later held invalid for lack of enablement.  *See*

20    583 F.3d at 1322.  Rather, the utility or functionality of the claimed invention must either

21    have been apparent—or at least not dubious—to one skilled in the art at the time of

22    invention or be substantiated by evidence in the specification.  *Rasmusson*, 413 F.3d at

23    1323.

24    The Court does not accept Defendants' argument that test data were required as a

25    matter of law to show utility in this case.  Rather, there is a dispute of fact with regard to

26    whether a person of ordinary skill in the art would consider lysine an obvious substitute

27    with similar effect as arginine.  This dispute weighs against summary judgment of

28    invalidity due to lack of enablement.

- 22 -

Plaintiff argues that when the '872 Patent issued, there were studies showing "L-lysine was just as effective as L-arginine to increase vascular NO activity," and that a person of ordinary skill in the art would understand this to be true because "L-lysine can ultimately be converted into L-arginine, which can be converted to nitric oxide." (Opp'n, ECF No. 135, at 25.)  Plaintiff points out that "Defendants' expert does not provide any opinion to the contrary," and does not opine on whether lysine is sufficiently enabled. (*Id.*)  To analogize, it may be that arginine and lysine are viewed in this art like butter and olive oil in the art of frying an egg.  If a patent disclosed using only butter to lubricate a pan, but a claim covered "using a substance from the group of cooking lubricants including butter and olive oil," it would be clear to the cook that the two would work similarly to lubricate the pan, and it would therefore not be necessary to provide details in the specification describing the use of olive oil.  The same may be true here, albeit in a less readily digestible art than egg frying.

Based on the current record, the Court cannot definitively say that a person of ordinary skill in the art in 1998, when this patent was filed, would consider arginine and lysine sufficiently interchangeable for the purposes described in this patent, but it does not need to.  Rather, to grant summary judgment, the Court would need to be able to say definitively that a person of ordinary skill in the art *would not* consider them sufficiently interchangeable, and there is at least some suggestion that a skilled artisan would have seen these amino acids that way.

The Defendants have not, therefore, met their burden of showing by clear and convincing evidence that they are entitled to judgment as a matter of law that the '872 Patent is invalid for failing to sufficiently disclose the utility of lysine.

(ii)     *Enablement of "Within 24 Hours" and "Within 6 Hours"*

The claims in the '872 Patent disclose administering certain compounds "within 24 h[ours]" of physical performance and "within 6 h[ours] prior to said physical performance." ('872 Patent, Ex. 2, ECF No. 132-4, at 15.)  Defendants say the examples in the specification do not disclose these "specific acute therapies," and that Plaintiff's

- 23 -

expert, Dr. Böger, agreed that the examples do not disclose the claimed acute therapy. (Mot., ECF No. 132-1, at 33–36.)  Plaintiff responds that there is no reason to doubt the utility of the statements in the '872 Patent's specification.  (Opp'n, ECF No. 135, at 27.)

For purposes of conventional enablement—teaching a skilled artisan how to make and use the invention—the time limits in these claims are self-explanatory: administer the substances within the stated time periods and the invention should work as described.  With regard to enablement by demonstrating utility, Defendants do not identify record evidence showing by clear and convincing evidence that a skilled artisan would have reason to doubt the efficacy of the acute dosing regimen or that the utility of the claimed inventions was dubious at the time of invention.

This conclusion is in tension with Plaintiff's argument regarding obviousness, in which Plaintiff contends that the acute supplementation regimen would not have been obvious to a skilled artisan given the prior art, specifically the *Ceremuzynski* reference and the '459 Patent.  It may be that if this aspect of the patent was not obvious, it was not enabled, or inversely, if it was enabled, it was also obvious.  However, the Court is not at this stage weighing competing evidence to determine what was and was not known in the prior art in this sophisticated field inhabited by those with doctoral degrees and work experience in the relevant scientific arts—those are questions of fact.  Rather, the Court is deciding whether there is a genuine dispute of material fact, and there is.  The fact finder must consider the competing evidence about how these claims would have been viewed at the time of invention.   Summary judgment for lack of enablement, therefore, is inappropriate.

## II.    The '459 Patent

The '459 Patent pertains to "Enhancement of Vascular Function by Modulation of Endogenous Nitric Oxide Production or Activity."  Defendants argue that claim 1 of the '459 Patent is anticipated and claim 10 is obvious.

/ / /

/ / /

**A.   *Anticipation of Claim 1***

(i)   *Anticipation*

Patent claims that are anticipated are invalid.  35 U.S.C. § 102.  A patent is anticipated if the claimed invention was used by others in this country, patented, or described in a printed publication before the date of invention or one year before the date the patent application was filed.  35 U.S.C. § 102(a)–(b) (pre-AIA).

A prior art reference anticipates a claim if it describes the claimed invention "sufficiently to have placed a person of ordinary skill in the field of the invention in possession of it."  *In re Spada*, 911 F.2d 705, 708 (Fed. Cir. 1990).  That means each claim limitation must be found "either expressly or inherently in a single prior art reference."  *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003).  A claim limitation is inherent if it is "necessarily present" in the prior art reference.  *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005) (citing *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003)).

As discussed above, a party challenging the validity of a patent must prove invalidity by clear and convincing evidence, and prior art references that were considered by the patent examiner are typically entitled to less weight than references that were not considered before the patent issued.  *Sciele Pharma Inc.*, 684 F.3d at 1260.

(ii)   *Anticipation of Claim 1 in Light of* Levere

Defendants argue that U.S. Patent No. 5,217,997 (*Levere*), titled "Use of L-Arginine in the Treatment of Hypertension and Other Vascular Disorders," anticipates claim 1 of the '459 Patent.  (Mot., ECF No. 132-1, at 38; *Levere*, Def. Ex. 17, ECF No. 132-20.)  That claim provides:

A method of improving vascular NO activity of the vascular system of a human host by enhancing endothelial NO, said method comprising: administering orally as a *dietary supplement* to said host in accordance with a predetermined regimen a prophylactic dose in an *amount sufficient to enhance endogenous endothelial NO*, L-arginine or L-arginine hydrochloride, as other than a natural food source and in the absence of other amino acids and

- 25 -

polypeptides as other tha[n] dietary supplements, to enhance the level of endogenous NO in the vascular system.

('459 Patent, Def. Ex. 4, ECF No. 132-6, at 26 (emphasis added).)

Plaintiff points out that the '459 Patent cites *Levere*, and that the patent examiner rejected some of the original claims because of that reference, but allowed them after the patentee made amendments.  (Opp'n, ECF No. 135, at 15–16.)

Plaintiff also argues that *Levere* does not provide evidence that "administrating L-arginine hydrochloride . . . increases nitric oxide at all, which is not . . . self-explanatory." (Opp'n, ECF No. 135, at 16.)  Plaintiff states that is a limitation present in claim 1 of the '459 Patent.  (Opp'n, ECF No. 135, at 16.)  Although *Levere* includes use of L-arginine, according to Dr. Böger, the reference describes activating "heme oxygenase, which is something very different from nitric oxide."  (*Id.* at 16.)  In their Motion, Defendants say *Levere* teaches that "L-arginine hydrochloride is 'the preferred salt,'" (Mot., ECF No. 132-1, at 41), and in their Reply state that Dr. Böger actually "conceded that this element was *disclosed* in *Levere*," (Repl., ECF No. 136, at 11).

Defendants say this "concession" occurred in the following exchange at Dr. Böger's deposition:

> Q: At least it discloses that L-arginine can be—is part of what results in the formation of nitric oxide; is that correct?
> A [Dr. Böger]: That is correct.
> Q: And in particular, they're referring to endothelium-derived nitric oxide; is that right?
> A: Yes, they do.

(Rep., ECF No. 136, at 11; Böger Dep., Def. Ex. 7, ECF No. 132-9, at 12.)  Dr. Böger admits that L-arginine is disclosed in *Levere* as "part of what results in the formation of nitric oxide," but that is not to say that *Levere* discloses using L-arginine as a "dietary supplement" to increase nitric oxide.  When asked soon after this exchange whether he would "agree that [*Levere*] is essentially disclosing there that the use . . . of L-arginine

- 26 -

increases vascular nitric oxide," Dr. Böger responded: "No, I don't."  (Böger Dep., ECF No. 132-9, at 14.)

It bears repeating that the Court is not deciding at this juncture whether the '459 Patent *is valid*, it is deciding whether there is a *dispute of fact* over whether it is *invalid*. Again, the qualifications of the person of ordinary skill in the art—a Ph.D. or medical doctor with work experience in a pertinent scientific field—are significant.  The Court cannot say that *Levere* indisputably discusses using L-arginine in the same manner and for the same effect as the '459 Patent.  There is, therefore, a dispute of fact with regard to the scope of the prior art and the differences between the art and the '459 Patent.

It is not enough for the patent to simply disclose each of the correct words or pieces of the invention.  Rather, to anticipate, the elements in the prior art have to work in the same way and do the same thing in as claimed invention.  Although *Levere* uses many of the same words as the '459 Patent, it does not follow that *Levere* indisputably discloses each element of the invention claimed in the '459 Patent, and that a skilled artisan who reads the *Levere* reference would be able to make and use the invention described in the '459 Patent.  The Court is in no position to discredit on summary judgment Dr. Böger's deposition testimony and expert report.

Further, the patent examiner already reached the conclusion that *Levere* does not fully describe the invention of claim 1.  Of course, the patent examiner's review of the prior art does not conclusively establish that a reference does not anticipate the claimed invention, but that review is entitled to deference, and together with Dr. Böger's understanding of *Levere*, certainly suggests that the Court cannot conclude that the scope of *Levere* is indisputably so broad that it describes, and therefore anticipates, the invention of claim 1 of the '459 Patent.  Defendants are, therefore, not entitled to summary judgment on that point.

(iii)   *Anticipation of Claim 1 in Light of* Leaf

Defendants assert that the *Leaf* reference, an article titled "L-Arginine Is a Precursor for Nitrate Biosynthesis in Humans," anticipates the invention of claim 1 in the '459 Patent.

(Mot., ECF No. 132-1, at 43; *Leaf*, Def. Ex. 16, ECF No. 132-19.)  Plaintiff counters that the premise of the *Leaf* article—that L-arginine is a precursor for endogenously synthesized nitrate in humans—is not the inventive aspect of what the '459 Patent claims, and the information Defendants cite to show anticipation was already disclosed as prior art in the '459 Patent.  (Opp'n, ECF No. 135, at 17.)  Rather, Plaintiff argues, the breakthrough in the '459 Patent pertained to L-arginine "increas[ing] nitric oxide synthesis above normal levels."  (Opp'n, ECF No. 135, at 17.)  Dr. Böger also opined that *Leaf* did not specify the "source or cellular origin," which Plaintiff says is another important aspect of the invention of claim 1, (*id.*), and that "what was not known was whether L-arginine would increase nitric oxide synthesis above normal levels, as nitrate does not cause endothelium-dependent vasodilation," (Böger Responsive Expert Report, Def. Ex. 15, ECF No. 132-18, at 12.)

In their Reply, Defendants argue that *Leaf* does in fact disclose nitric oxide synthesis above normal levels, because the authors in *Leaf* noted "[t]he two subjects excreted [15N]NO3 above the naturally occurring abundance" and that "[t]his work demonstrates that L-arginine . . . is a precursor for endogenously synthesized nitrate in humans. Macrophages and endothelial cells are capable of producing NO from L-arginine in vitro and these same cells may be responsible for this novel oxidation of L-arginine to nitrate in humans."  (Rep., ECF No. 136, at 10.)  At his deposition, Plaintiff's expert Dr. Böger disagreed that the cited passage disclosed increased nitric oxide, but instead that "levels of nitrogen 15 labeled nitrate were above the naturally occurring abundance of the isotope nitrogen 15 nitrate in the 24-hour urine.  They [the authors of *Leaf*] just referred to the abundance of that isotope that they used for labeling."  (Böger Dep., Def. Ex. 7, ECF No. 132-9, at 18)

Defendants' argument in their Reply loops back to the premise that Plaintiff says was disclosed as prior art in the '459 Patent: that L-arginine is a precursor for endogenously synthesized nitrate in humans.  These excerpts do not show that, as Defendants argue, *Leaf* indisputably discloses every element of the claimed invention, specifically that of L-

- 28 -

arginine increasing nitric oxide synthesis above normal levels, as opposed to simply disclosing that L-arginine is a precursor to endogenously synthesized nitrate and the fact that the subjects studied in *Leaf* ended up excreting higher than normal "[15N]NO3" levels.[7]  In other words, according to Plaintiff, a person of skill in the art could read about the use of L-arginine and the "[15N]NO3" levels in *Leaf* and would not necessarily know that *supplementing* L-arginine could *increase* the levels of nitric oxide in the vascular system, as described in claim 1 of the '459 Patent.  The Court cannot say Plaintiff is indisputably incorrect about what the skilled artisan would take away from reading *Leaf*.

Accordingly, there is a genuine dispute of material fact with regard to whether *Leaf* discloses each element of the invention of claim 1 of the '459 Patent—Defendants say it does, Plaintiff's expert testified it does not.

### B. *Obviousness of Claim 10 Considering* Levere *and* Mugge

Defendants argue that claim 10 of the '459 Patent is obvious considering the *Levere* reference and the *Mugge* reference, titled "Chronic Treatment with Polyethylene-Glycolate Superoxide Dismutase Partially Restores Endothelium-Dependent Vascular Relaxations in Cholesterol-Fed Rabbits," and published in the journal Circulation Research in November 1991.  (Mot., ECF No. 132-1, at 46.)

### (i) *Waiver of Use of* Mugge *Reference*

Plaintiff argues Defendants may not rely on the *Mugge* reference for invalidity because they did not disclose the reference in their Invalidity Contentions as invalidating art for the '459 Patent, and their expert did not offer any opinion on the validity of the '459 Patent in light of *Levere* combined with *Mugge*.  (Opp'n, ECF No. 135, at 18.)  Perhaps tellingly, Defendants do not address this argument in their Reply.  (*See* Rep., ECF No. 136, at 10–11.)

---

[7] The distinction may be that, in this field, one compound could be a precursor to another compound without it being obvious that adding more of the precursor compound as a supplement would lead to more of the successor compound.

Patent Local Rule 3.3 requires parties in patent litigation to submit invalidity contentions identifying "each item of prior art that allegedly anticipates each asserted claim or renders it obvious."  Courts may find that a party's failure to disclose a prior art reference in its invalidity contentions waives that party's ability to rely on that prior art for invalidity. *See I-Flow Corp. v. Apex Med. Techs., Inc.*, No. 07CV1200 DMS (NLS), 2008 WL 2899822, at *5 (S.D. Cal. July 25, 2008) (finding defendants waived their argument that a claim term should be construed as a means-plus-function element because they failed to disclose that theory in their invalidity contentions, as required by Patent Local Rule 3.3); *cf. Teashot LLC v. Green Mountain Coffee Roasters, Inc.*, 595 F. App'x 983, 987 (Fed. Cir. 2015) (affirming district court's finding that party waived its theory of infringement via doctrine of equivalents by failing to disclose this theory in infringement contentions).  One of the reasons for requiring invalidity contentions is to provide the opposing party with notice of prior art that will be relied on to invalidate particular claims, and to allow discussion and evaluation of that art as it pertains to particular claims by experts in their reports and at depositions.  Expert reports and deposition testimony pertaining to other prior art references and claims are important components of the record for this Motion.

Accordingly, the Court holds that Defendants waived their argument that the combination of *Levere* and *Mugge* render claim 10 of the '459 Patent obvious because they failed to disclose the *Mugge* reference as invalidating art for this claim in their invalidity contentions.

(ii)    *Validity of Claim 10 in Light of* Levere *and* Mugge

Even if the Defendants did not waive their ability to rely on *Mugge* to invalidate claim 10, Defendants are not entitled to summary judgment of invalidity for this claim.

First, Defendants have not identified evidence that would prompt a skilled artisan to combine these references, and the Court, lacking the qualifications of a person of ordinary skill in this art, cannot say as a matter of common sense that one would think to combine *Levere* and *Mugge*.

- 30 -

Next, Plaintiff argues that, assuming a skilled artisan would combine these references, they do not render claim 10 of the '459 Patent obvious because *Mugge* pertained to *injection* into *rabbits* with high cholesterol, as opposed to *oral administration* to *humans* as disclosed in claim 10. (Opp'n, ECF No. 135, at 18.) In other words, it was not obvious that intravenously injecting a substance into rabbits would have the same effect as it would in humans taking the substance orally. (*Id.*) To bolster this argument, Plaintiff points to Defendants' expert's statement that the way a compound is administered will affect how the body processes that compound. (*Id.* at 19.)

Further, *Mugge* discloses use of "PEG-SOD," which Dr. Böger said "has to be injected . . . [and is] not suitable for oral administration." (Böger Dep., Def. Ex. 7, ECF No. 132-9, at 45.) Defendants offer no rejoinder to these arguments in their Reply with regard to the '459 Patent, but with regard to the '916 Patent, state that a person of ordinary skill in the art would have recognized how these compounds could be administered orally. (Rep., ECF No. 136, at 13.)

Given the factual questions regarding *Levere*, which are discussed above, as well as Dr. Böger's insight regarding the differences between *Mugge* and claim 10, the Court cannot say Defendants have demonstrated by clear and convincing evidence that a person of ordinary skill in the art would, viewing *Mugge* and *Levere* together, think the invention of claim 10 of the '459 Patent obvious, or put differently, that all that is claimed is a combination of known elements that yielded expected results. Relatedly, the Court cannot say there is no genuine dispute of material fact with regard to the content of the references in this case and their comparison to the invention covered by claim 10.

Because there is a lack of evidence regarding motivation to combine these references and a dispute of fact over the extent to which these inventions actually disclose certain elements and compare to the invention of claim 10, Defendants are not entitled to summary judgment with regard to claim 10 of the '459 Patent.

/ / /

/ / /

- 31 -

## III.    The '916 Patent

The '916 Patent relates to "Enhancement of Vascular Function by Modulation of Endogenous Nitric Oxide Production or Activity."  Defendants contend the asserted claims 1, 2, and 6 are obvious in light of the prior art.

### A.    *Obviousness of Claim 1 Considering* **Levere** *and* **Werner-Felmayer**

Defendants argue that claim 1 of the '916 Patent is obvious in light of the *Levere* reference and the *Werner-Felmayer* reference, titled "Pteridine Biosynthesis in Human Endothelial Cells," published in the January 25, 1993, issue of the Journal of Biological Chemistry.

First, Plaintiff argues that a person of ordinary skill in the art would have no motivation to combine the *Levere* and *Werner-Felmayer* references. (Opp'n, ECF No. 135, at 21.)  Defendants have not produced evidence that a skilled artisan would have had a reason to combine the *Levere* and *Werner-Felmayer* references.

Next, assuming a skilled artisan would combine these references, it is not clear the invention would have been obvious.  During prosecution, the patent examiner reviewed the *Levere* reference, which was the basis for the patentee's amendment of claim 1.  (Opp'n, ECF No. 135, at 21.)  Plaintiff argues that because the patent examiner considered *Levere* and allowed this claim after it was amended, that reference is entitled to little weight as invalidating art.  (*Id.*)  Specifically, the patentee added the following claim limitation because of *Levere*: "and wherein the composition further comprises at least one additional compound associated with production of nitric oxide other than L-arginine or a physiologically acceptable salt thereof."  (*Id.* at 20–21.)  Defendants point out that the only claim limitation not covered by *Levere*, therefore, is the limitation added in this amendment.  (Rep., ECF No. 136, at 12.)

Plaintiff also notes that *Werner-Felmayer* pertains to "in-vitro examination of human umbilical vein endothelial cells," as opposed to providing an "in vivo (human host)-related" disclosure.  (Opp'n, ECF No. 135, at 20.)  Therefore, Plaintiff argues, this reference is far from making the "oral administration of a compound associated with

- 32 -

production of nitric oxide other than L-arginine or a physiologically acceptable salt thereof" obvious to a person of ordinary skill in the art.  (*Id.*)   Accordingly, there is a factual question of whether in vitro use of tetrahydrobiopterin in *Werner-Felmayer* would have made the '916 Patent's claimed element of an "additional compound associated with production of nitric oxide other than L-arginine" obvious to a person of ordinary skill in the art.

Plaintiff further argues that, despite some overlap, *Levere* actually teaches away from the dosage range of the invention of the '916 Patent's claim 1.  (*Id.* at 21.)  The '916 Patent teaches of a "daily amount ranging from 1 to 12 grams of L-arginine or its physiologically acceptable salt . . . ."  ('916 Patent, Def. Ex. 3, ECF No. 132-5, at 39.) *Levere*, on the other hand, teaches that the "typical effective amount" would be "1 mg to about 1500 mg per day, more preferably, about 10 mg to about 400 mg." (Opp'n, ECF No. 135, at 21; *Levere*, Def. Ex. 17, ECF No. 132-20, at 9.)  Thus, although the range in claim 1 overlaps with *Levere* by 500 milligrams—from 1 gram to 1.5 grams—it teaches that the optimal dose is an amount below the range described in claim 1.

Plaintiff's reliance on *Ormco Corp. v. Align Technology, Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006), is persuasive here.  "Where a claimed range overlaps with a range disclosed in the prior art," as is the case here, "there is a presumption of obviousness."  *Id.* This presumption "can be rebutted if it can be shown that the prior art teaches away from the claimed range, or the claimed range produces new and unexpected results."   *Id.* Although there is overlap in the ranges here, the overlap is for only 500 milligrams of an 11,000 milligram range, and *Levere* instructs that a dose below the claimed range is preferable.  Thus, it may be that, to some extent, *Levere* actually teaches away from the range claimed.  This ultimately turns on an assessment of the significance of the preferred range in *Levere* as compared to the total range disclosed, and then a comparison of that art to claim 1.   Thus, there are factual questions regarding the scope of *Levere* and its comparison to claim 1.

Altogether, there is a lack of evidence that a skilled artisan would have thought to combine these references and a dispute of fact over whether doing so would give the skilled artisan the information necessary to reliably predict that putting those elements together would yield the same results as the invention covered by claim 1 of the '916 Patent. Defendants have not shown, therefore, that *Levere* and *Werner-Felmayer* render claim 1 of the '916 Patent obvious as a matter of law.

### B. *Obviousness of Claims 2 and 6 Considering* **Levere** *and* **Mugge**

Defendants assert that claims 2 and 6 of the '916 Patent are obvious in light of the *Levere* and *Mugge* references. (Mot., ECF No. 132-1, at 52.)

Plaintiff suggests a skilled artisan would not think to combine *Levere* with *Mugge* because *Mugge* pertained to injecting rabbits that had high cholesterol with PEG-SOD, as opposed to oral administration of the substances disclosed in claims 2 and 6 of the '916 Patent to humans, and thus represented art from different fields of endeavor. (*Id.*)

Defendants respond that a person of ordinary skill in the art at the time of the invention would know about the compounds associated with nitric oxide and antioxidants that are listed in these claims, would understand from these references that these compounds would have positive effects on nitric oxide, and would consider it common sense that these compounds could be administered orally. (Rep., ECF No. 136, at 12.)

As with the other obviousness inquiries, these references do not lend themselves to a conclusion that, indisputably, a scientist with a doctoral degree and some years of work experience would read them and have no trouble formulating the inventions covered by claims 2 and 6 of the '916 Patent. This is a situation where a fact finder, aided by experts with qualifications in the relevant field, will need to listen to and assess the credibility of testimony regarding the scope of the prior art and whether a skilled artisan would think to combine these references to create the invention covered by these claims.

Consequently, there is a genuine dispute of fact regarding whether the *Levere* and *Mugge* references render claims 2 and 6 of the '916 Patent obvious, so summary judgment is inappropriate.

## IV.   The '006 Patent

### A.   *Obviousness of Claims 3, 4, 5, 8, 10, and 14*

Defendants argue that claims 3, 4, 5, 8, 10, and 14 of the '006 Patent are obvious when considering the *Levere* reference in light of either the *Werner-Felmayer* or *Mugge* references, or both.  (Mot., ECF No. 132-1, at 55.)

Plaintiff responds that, for many of the reasons given above, those references would not actually render these claims obvious, and more importantly, Defendants have not identified any evidence suggesting a person of ordinary skill in the art would think to combine these references.  (Opp'n, ECF No. 135, at 23.)  Again, Defendants' rejoinder that common sense may provide the motivation to combine is unavailing given the sophistication of the technology claimed by this patent and discussed in these references.  *See Wyers*, 616 F.3d at 1240 n.5.

Defendants' argument regarding the "'expansive and flexible approach' in determining obviousness in *KSR*" is simply too expansive and too flexible.  *See id.*  This conclusion may be frustrating to those familiar with the science and technology of this field of endeavor.  But the knowledge base of a particular field or scientific community, and what may be common sense within it, does not always fit easily within the procedural requirements of patent infringement litigation.  As with any proceeding, the Court must rely primarily on record evidence, which for pertinent purposes for Defendants is either lacking or in dispute.  There are certainly times when common sense compels certain conclusions even in the absence of specific evidentiary showings.  This is not one of those times.

To be entitled to summary judgment, Defendants bear the burden of identifying evidence in the record entitling them to summary judgment.  In this case, that record evidence must establish that these claims are obvious by clear and convincing evidence.  Because Defendants' obviousness argument relies on combining prior art references in a technological realm outside of a layperson's common sense, that means they must identify record evidence suggesting a motivation to combine.  As Plaintiff points out, Defendants

- 35 -

have not done that.  Accordingly, Defendants are not entitled to summary judgment of obviousness of claims 3, 4, 5, 8, 10, and 14 when considering the *Levere* reference in light of either the *Werner-Felmayer* or *Mugge* references, or both.

### B.    *Obviousness of Claims 1 and 2*

Defendants contend that claims 1 and 2 of the '006 Patent are obvious when considering the *Levere* reference in light of the *Mugge*, *Werner-Felmayer*, and *Fitzpatrick* references.    (Mot., ECF No. 132-1, at 65.)    The *Fitzpatrick* reference is titled "Endothelium-Dependent Vasorelaxing Activity of Wine and Other Grape Products," and is dated 1993.  (*Fitzpatrick*, Def. Ex. 25, ECF No. 132-28.)  Plaintiff points out that both *Fitzpatrick* and *Levere* were cited on the face of the '006 Patent, and that *Fitzpatrick* was actually discussed as disclosing matters known in separate arts such that a skilled artisan in this art would lack a motivation to combine it with other references.  (Opp'n, ECF No. 135, at 24.)

As with the other claims in the '006 Patent, Defendants are not entitled to judgment as a matter of law with regard to obviousness of claims 1 and 2 because they have not identified evidence that a person of ordinary skill in the art would think to combine these references, and if they did, that this skilled artisan would find the inventions described in claims 1 and 2 obvious.

### CONCLUSION

Because there are genuine disputes of material fact with regard to the scope and content of the prior art, the differences between the claims at issue and the prior art, and, with regard to obviousness, Defendants have not shown the highly skilled artisan in the field relevant to these patents would have had a reason to combine the references Defendants cite, Defendants' Motion for Summary Judgment that the asserted patent claims are invalid due to obviousness and anticipation is **DENIED**.  Additionally, because there is a genuine dispute of material fact with regard to whether the specification of the '872 Patent sufficiently enables a person of ordinary skill in the art to make and use the

invention by setting forth its utility, Defendants' Motion for Summary Judgment with regard to lack of enablement and utility is **DENIED**.

　　　　**IT IS SO ORDERED.**

Dated:  December 8, 2015

Hon. Janis L. Sammartino
United States District Judge

- 37 -