1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERMOLIFE INTERNATIONAL, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MYOGENIX CORP.; GNC CORPORATION; GENERAL NUTRITION CENTERS, INC.; and GENERAL NUTRITION CORPORATION,<br><br>Defendants. | Case No.: 13cv651 JLS (MDD) (LEAD CASE)<br><br>**ORDER (1) DENYING GNC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF EQUITABLE ESTOPPEL AND (2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF LACHES**<br>(ECF Nos. 186, 190) |

Presently before the Court is Defendants and Counterclaimants GNC Corporation, General Nutrition Centers, Inc., and General Nutrition Corporation's (collectively GNC) Memorandum of Points and Authorities in Support of Their Renewed Motion for Summary Judgment on the Grounds of Laches and Equitable Estoppel (MSJ). (ECF No. 190 (Sealed).) Also before the Court are Plaintiffs' Opposition to, (ECF No. 192 (sealed)), and GNC's Reply in Support of, (ECF No. 198 (sealed)), the MSJ.

For the reasons discussed below, the Court **GRANTS IN PART AND DENIES IN PART** GNC's MSJ. In particular, the Court **DENIES** GNC's motion to bar this infringement suit against GNC in its entirety based on the defense of equitable estoppel, but **GRANTS** GNC's motion to preclude damages that accrued before this action was filed based on the equitable defense of laches.

# BACKGROUND

ThermoLife International, LLC (ThermoLife) asserts claims from four patents in this proceeding: U.S. Patent Nos. 5,891,459 (the '459 Patent), 6,117,872 (the '872 Patent), 6,646,006 (the '006 Patent), and 7,452,916 (the '916 Patent).  (Am. Compl., ECF No. 122.) Co-plaintiff the Board of Trustees of the Leland Stanford Junior University (Stanford) owns these patents, and ThermoLife exclusively licenses them.  (MSJ, ECF No. 190, at 5.)[1]  Broadly speaking, the asserted patents relate to administering the amino acid arginine to enhance vascular nitric oxide production.  (*Id.* at 6.)  Plaintiff alleges that several of GNC's products infringe these patents.  (*Id.* at 5.)

The first of the asserted patents, the '459 Patent, issued on April 6, 1999, with John P. Cooke, Victor J. Dzau, and Gary H. Gibbons as the named inventors.  ('459 Patent, ECF No. 72-1.)  The '872 Patent issued on September 12, 2000, with Cooke and Andrew J. Maxwell named as inventors, ('872 Patent, ECF No. 72-2); the '006 Patent issued on November 11, 2003 with Cooke, Dzau, and Gibbons named as inventors, ('006 Patent, ECF No. 72-3); and the '916 Patent issued on November 18, 2008, with Cooke named as the sole inventor, ('916 Patent, ECF No. 72-4).  These patents were each assigned first to Stanford.  (*See* MSJ at 6; Am. Compl. ¶ 4, ECF No. 122.)

ThermoLife is not the first licensee of these patents.  Several were first licensed to Cooke Pharma, a company owned and operated by Cooke, the common inventor on the asserted patents.  (Bentz Decl., Ex. A, ECF No. 190-2, at 2.)  United Therapeutics (UT) acquired Cooke Pharma and assumed its rights under the license agreement with Stanford. (Bentz Decl., Ex. B, ECF No. 186-6, at 27–28.)  UT therefore became the exclusive licensee of the patents.  (*Id.*)  After acquiring the rights to the '459 Patent and those related to it, UT contacted various companies who were advertising "nutraceutical" products that purported to improve vascular function and for which L-arginine was the main ingredient,

/ / /

---

[1] Pinpoint citations to docketed materials refer to the CM/ECF number electronically stamped at the top of each page.

notifying them of its L-arginine supplementation patents and inviting them to explain why the products advertised did not infringe.  (*See, e.g.*, Bentz Decl. Ex. C, ECF No. 190-3, at 4, 7 (identifying '459 and '872 Patents, among others).)

One of the companies UT contacted was GNC.  GNC received its first letter on this topic in May 2001.  (Bentz Decl., Ex. H, ECF No. 190-5, at 28.)  The letter referred to the '459 and '872 Patents, along with a slew of others "directed generally to the use of L-arginine to improve vascular function."  (*Id.*)  UT stated:

> We have recently conducted an investigation through which we have confirmed that you are advertising products that contain L-arginine as a main ingredient and that purportedly improve vascular function.  Specifically, you are marketing GNC's L-arginine pills for this purpose.
>
> We invite you to explain to us why the use of your products would not be covered by the claims of the above-mentioned patents.

(*Id.*)  GNC replied that it would look into the matter, (Bentz Decl., Ex. I, ECF No. 190-5, at 30), and in June 2001 followed up by asking UT to identify specific products and advertising that UT believed fell within the scope of its patents, (Bentz Decl., Ex. J, ECF No. 190-6, at 2).  The next week, UT identified various products, including several at issue in this litigation: GNC's Arginmax for Men, Arginmax for Women, A-Z Arginine 1000mg tablets, and Effervescent L-Arginine packets.  (Bentz Decl., Ex. K, ECF No. 190-6, at 4; Bentz Decl., Ex. K, ECF No. 190-6, at 4.)

UT sent GNC another letter related to its L-arginine patents in December 2002, this time referring to a patent application that would eventually mature into the '006 Patent.  (Bentz Decl., Ex. M, ECF No. 190-6, at 157–58.)  This letter referred to litigation with another pharmaceutical company that had settled when that company agreed to sub-license UT's patents.  (*Id.*)  UT indicated that it was "now offering makers of L-Arginine-supplements a standard license to these patents on favorable economic terms."  (*Id.*)  GNC did not take a license, however.

UT raised the matter again in March 2003, to which GNC responded that it had investigated UT's patents and its own products, and that GNC did not believe it was

infringing.  (Bentz Decl., Ex. N, ECF No. 190-6, at 176, 184.)  In its follow-up letter, GNC asked UT to be more specific about what claims GNC allegedly infringed, but UT did not respond to this inquiry.  (*See id.* at 174; MSJ at 8.)  UT sent its final letter on this subject in March 2007, this time referring explicitly to the '006 Patent, which had issued by that point.  (Bentz Decl., Ex. N, ECF No. 190-6, at 185.)  GNC again requested that UT identify the names of products UT believed infringed its patents, (Bentz Decl., Ex. O, ECF No. 190-6, at 187), but UT never responded or otherwise attempted to enforce its L-arginine patents against GNC, (*see* MSJ at 9).

In its 2008 10-K filed with the Securities and Exchange Commission, UT stated:

> In September 2007, we discontinued all sales of our arginine products and we reevaluated our assumptions used in determining the value of our arginine patents, based on a then recent publication discounting the benefits of arginine supplementation and a June 2007 Supreme Court decision concerning the enforceability of patents.  This decision has no effect on our current licenses with companies selling arginine products.

(Bentz Decl., Ex. P, ECF No. 186-8, at 19.)  GNC did not notice this statement at the time, but instead learned about it through this litigation.  (Woods Decl., Ex. B, ECF No. 195-1, at 10–11.)

UT licensed these patents from Stanford for four more years after filing this 10-K, and in September 2012 terminated its exclusive license.  (Bentz Decl., Ex. F, ECF No. 190-4, at 80–82.)  ThermoLife began licensing the patents in suit from Stanford several months later, in February 2013.  (Bentz Decl., Ex. G, ECF No. 190-5, at 2.)  The month after it licensed the patents, ThermoLife sued GNC.  (*See* Compl., ECF No. 1.)

According to GNC Vice President and General Counsel David Sullivan, GNC interpreted UT's failure to respond to GNC's 2003 letter as agreement that its products did not infringe, (Bentz Decl., Ex. R, ECF No. 190-7, at 4), and understood the 2007 correspondence as a sort of "last shot at a license," (MSJ at 10).  Since then, GNC has "continued to develop, produce, market, and distribute nutritional supplements containing L-arginine since as early as 1995."  (Butera Decl. ¶ 2, ECF No. 190-1, at 2.)  GNC began

marketing many of its L-arginine products more than six years before this lawsuit was initiated, including: L-Arginine 500 (July 1995); L-Arginine L-Ornithine (January 1999); ArginMax (April 2001); Mega Men Sport (November 2006); and Powder L-Arginine 5000 (April 2006).  (Butera Decl. ¶¶ 3, 5, ECF No. 190-1, at 2–3.)  GNC's other accused products were marketed before GNC had notice of this action, and include: NO Loaded (March 2009); Arginine 5000 Rapid Drive (April 2010); Mega Men Endurance Vita-Pack (July 2011); Men's Staminol Ultra (August 2011); Re-grow (February 2012); Ravage (October 2010); Rampant (October 2011); and Pre-Workout Igniter (January 2012).  (*Id.* at ¶ 3.)

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact.  *Id.*  When a party seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

5

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

## ANALYSIS

As a threshold matter, all parties agree that, as a prior licensee of the asserted patents, UT's conduct is imputed to ThermoLife for purposes of the equitable defenses of estoppel and laches. (Opp'n at 13 ("Plaintiffs do not contest that case law exists indicating that a plaintiff may be held responsible for the conduct of its patentee/licensee predecessors-in-interest when determining laches and estoppel.") The Court therefore treats UT's conduct as though it were ThermoLife's.

## I.   Equitable Estoppel

### A.   *Legal Standard*

The defense of equitable estoppel may entirely bar a patentee's claim against an accused infringer. *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc). This defense focuses on what the patentee's conduct has reasonably led the accused infringer to believe, whereas laches, discussed below, focuses on the whether a patentee's delay was reasonable. *Id.* at 1034. For equitable estoppel, "more is required in the overall equities" than for the laches defense, because the former bars claims altogether whereas the latter places limits on the remedy available. *See id.* at 1040. For equitable estoppel to preclude a patentee's claims, the accused infringer must establish three elements:

a. The patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer. "Conduct" may include specific statements, action, inaction, or silence where there was an obligation to speak.

b. The alleged infringer relies on that conduct.

c. Due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*Id.* at 1028; *see also Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1310 (Fed. Cir. 2010). The first element—misleading conduct—requires a showing of actions sufficient to support "an inference that the patentee did not intend to press an infringement claim against the alleged infringer." *Aukerman*, 960 F.2d at 1042. The "most common situation" in which equitable estoppel arises involves a specific objection by the patentee "to the activities currently asserted as infringement in the suit" followed by a failure for years to follow up on that objection. *Id.* Where equitable estoppel is based on inaction, however, there must be other facts pertaining to the contacts or the relationship between the parties to support the inference that the patentee abandoned the claim against the defendant. *Id.* "Misleading action by the patentee may be silence, if such silence is accompanied by some other factor indicating that the silence was sufficiently misleading to amount to bad faith." *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1064 (Fed. Cir. 1995) (citing *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1295 (Fed. Cir. 1992); *Aukerman*, 960 F.2d at 1042).

Unreasonable delay is not an element of the equitable estoppel defense, but may be relevant to whether a patentee's conduct was misleading. *Aukerman* 960 F.2d at 1042. A defendant does not need to show that the patentee intended to mislead. *Id.* at 1043. Where the alleged misleading act is silence alone, the patentee must have had "a clear duty to speak . . . or somehow the patentee's continued silence reinforces the defendant's inference" that the patentee will leave the defendant alone. *Id.* at 1043–44. "[T]he longer the delay, the stronger the inference becomes." *Id.* at 1044.

/ / /

When deciding equitable estoppel on summary judgment, the inference that the patentee planned not to enforce its patent against the defendant's particular activity "must be the *only* possible inference from the evidence." *Id.* at 1044 (emphasis original). For example, in *Aukerman*, the Federal Circuit held that summary judgment was improper where the accused infringer could have inferred that the patentee was choosing not to press suit because the potential recovery was "*de minimis*," rather than abandoning a potential claim altogether. *Id.* at 1044. That was so even though the evidence "favor[ed] the nonenforcement inference." *Id.*

The second element is reliance. *Id.* at 1042–43. To satisfy this element, the defendant must typically show that its relationship to or communication with the patentee "lulls the infringer into a sense of security." *Id.* at 1043. For example, if an accused infringer builds a plant that it can no longer use, but it did not do so based on a sense of security created by a communication or its relationship with the patentee, it may be prejudiced but has not in fact relied. *See id.* at 1042–43. To show reliance, however, an accused infringer is not required to "prove precisely what alternative paths it would have taken, or that every marketing decision was based on reliance on [the patentee's] silence." *Aspex Eyewear*, 605 F.3d at 1312.

The third element is material prejudice, which may be economic or evidentiary. *A.C. Aukerman Co.*, 960 F.2d at 1043. Because the Court need not address prejudice in the context of equitable estoppel, the standards governing this element are set out more fully in section II.A, in which the Court discusses laches.

Even when all three elements are established, courts must "take into consideration any other evidence and facts respecting the equities of the parties in exercising [their] discretion and deciding whether to allow the defense of equitable estoppel to bar the suit." *Id.* at 1043.

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B. *Analysis*

#### (i) *Misleading Conduct*

Although the Court bases its conclusion that GNC is not entitled to summary judgment on its equitable estoppel defense primarily on disputes of material fact with regard to reliance, it nonetheless notes that there are competing inferences with respect to misleading conduct that would also bar inequitable conduct.  GNC was not aware of UT's statement in its 10-K.  GNC cannot therefore point to this as a misleading statement. Additionally, while a fact finder could conclude that UT's 2007 letter was a last shot at a license, after which UT gave up on enforcing these patents altogether, UT's sporadic communications could also suggest that UT might wait several more years and again decide to enforce its L-arginine patents, such that these communications do not necessarily evince an intent not to enforce these patents.  Lastly, as an equitable matter, UT's conduct was not really misleading.  Rather, it appears UT had little interest in enforcing the patents, whereas ThermoLife, a subsequent licensor, licensed the patents precisely to enforce them.  While UT's conduct is imputed to ThermoLife, the Court would still conclude that the equities weigh against deeming this conduct "misleading."

#### (ii) *Reliance*

GNC has not established that it relied on UT's nonenforcement of its patent rights. ThermoLife argues that GNC did not rely on UT's failure to follow up on its letters, or at least that there is a dispute of fact over whether GNC relied.  At its Rule 30(b)(6) deposition, GNC testified that it did not make any changes to its promotion, advertising, or marketing of the accused products from 2001 to 2003 because of the letters from UT because it did not believe it infringed UT's patents. (Woods Decl., Ex. B, ECF No. 195-1, at 15.)  GNC also testified that it "relied on the fact that we didn't hear from [UT] for four years, from 2003 to 2007, you know, that we weren't infringing their patents."  (*Id.*)  In fact, GNC did not even discuss the possibility of stopping marketing of the accused products based on the letters, nor did it consider increasing its marketing activities "because of the lack by United Therapeutics to pursue legal action against GNC."  (*Id.* at 6.)

1  ThermoLife contends that GNC did not rely on UT's silence following its threats of patent
2  enforcement, but instead relied on its position that the accused products did not infringe
3  UT's patents, and that it continued marketing them on that basis.  (Opp'n at 20–21.)

4      In *Gasser Chair*, the accused infringer continued to produce allegedly infringing
5  products, despite warnings from the patentee, because he believed the patent was invalid.
6  *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 772–73 (Fed. Cir. 1995).  The
7  Federal Circuit held that the accused infringer was not entitled to equitable estoppel
8  because he could not show reliance on the patentee's misleading conduct.  *Id.* at 776.
9  Rather, the evidence showed that the accused infringer relied instead on a "business
10  judgment"—his belief that the patent was invalid in continuing to market the accused
11  products.  *Id.*

12      In *Aspex Eyewear*, the patentee and the accused infringer had discussions similar to
13  the correspondence in the instant case: a letter from the patentee identified patents and
14  indicated the recipient's products may infringe; the accused infringer responded weeks
15  later asking for more information; soon after the patentee followed up with greater
16  specificity about the possible infringement.  *See* 605 F.3d at 1308–10.  One significant
17  difference, however, is that patentee's initial correspondence identified the two patents that
18  were later asserted in litigation, but the follow up letters dropped them from the discussion.
19  *Id.* at 1309.  The implication was that the patentee no longer believed the accused infringer
20  infringed those particular patents.  *See id.* at 1309, 1312.  Of course, the patentee several
21  years later sued alleging infringement of those very patents.  *See id.* at 1310.  The Federal
22  Circuit affirmed the district court's finding of reliance because it was "undisputed that [the
23  defendant] took into account [the patentee's] failure to pursue" the patents that were
24  dropped from the correspondence.  *See id.* at 1312.  By contrast here UT continued to
25  include additional L-arginine patents as Stanford prosecuted and accumulated more, giving
26  no such clear indication upon which GNC could rely in deciding to practice aspects of the
27  inventions of these patents.

28  / / /

To the contrary, there is evidence from which a reasonable fact finder could infer that the correspondence from UT and failure by UT to follow through on its patent enforcement threats were not a factor in GNC's marketing and production investment decisions.  When asked whether GNC considered UT's silence in marketing its L-arginine products, GNC's representative stated both that it did not take them into account[2] and that it relied on the silence as tacit agreement by UT that GNC's products did not infringe.  In any event, there is evidence in this case suggesting that GNC's decision to continue marketing its products was based not on the notion that that UT would not sue, but that it did not infringe UT's patents.  (*See* Bentz Decl., Ex. N, ECF No. 190-6, at 184.)  The Court sees no reason to distinguish an accused infringer's decision to proceed on the belief that a patent is invalid, which the Federal Circuit concluded thwarted the reliance element in *Gasser Chair*, 60 F.3d at 776, and GNC's apparent decision to proceed on the belief that its products did not infringe.

GNC informed UT of its belief that its products did not infringe UT's patents in 2003, and UT reasserted its infringement position again in 2007.  This could be interpreted as a last ditch effort to monetize its patents through licensing or as disagreement with

---

[2] Specifically, GNC testified:

> Q. From the period of May 2001  through April 2003, which is almost a two-year period, did GNC make any  changes to its promotion, advertising or marketing of any of the accused products in this case in reliance upon the  assertions in any of the letters it  received from United Therapeutics during  that time period?
> [GNC:] No.
> Q. And as we already discussed, the reason why it didn't is because it did not believe it infringed the patents at that time; correct?
> [GNC:] Correct.
> . . .
> Q. Did GNC ever have a discussion about whether or not it should continue marketing or discontinue marketing any of the accused products because of the allegations in the May 15, 2001 letter and ensuing letters?
> [GNC:] No.
> Q. Did GNC have any communications about increasing its marketing of the accused products because of the lack by United Therapeutics to pursue legal action against GNC?
> [GNC:] No.

(Woods Decl., Ex. B, ECF No. 195-1, at 6.)

GNC's noninfringement position, such that GNC's investment in its L-arginine products in the following two years was made *in spite of* UT's contention that the products infringed, rather than because UT remained silent.

To be clear, GNC's noninfringement position and alleged reliance on UT's misleading representation are not mutually exclusive. GNC may have forged ahead in marketing the accused products safe in the beliefs both that it did not infringe and that UT would not sue. The factual dispute that precludes summary judgment here pertains to whether GNC in fact relied on UT's misleading conduct. While there is testimonial evidence to suggest that GNC did, there is also testimonial evidence to suggest that it did not, in particular, GNC's statements that it did not discuss changes to its production and marketing decisions based on UT's inactivity. Additionally, there is contemporaneous documentary evidence demonstrating that GNC took a noninfringement position, but GNC has presented no contemporaneous evidence showing that it relied on the allegedly misleading conduct.

Accordingly, there is a dispute of fact over whether GNC would have continued to invest in its L-arginine products based on its noninfringement position even if UT had been more diligent in asserting its patent rights (which would show a lack of reliance), or whether that investment was made based on a sense of security that UT would not sue *and* that its patents did not infringe (which would show reliance). This factual dispute precludes summary judgment of equitable estoppel. The Court therefore **DENIES** GNC's MSJ on this point.

### (iii)  *Prejudice*

Because the Court concludes that equitable estoppel is not warranted on summary judgment based on the reliance element and, alternatively, the misleading conduct element, prejudice is discussed in the context of laches below.

/ / /

/ / /

/ / /

## II.   Laches

### A.   *Legal Standard*

Laches is generally a "slackness or carelessness toward duty or opportunity." *A.C. Aukerman Co.*, 960 F.2d at 1028.  If an accused infringer establishes the equitable defense of laches, the patentee's damages that predate the filing of the suit may be barred.  *Id.*  An accused infringer asserting laches must show: "(a) the patentee's delay in bringing suit was unreasonable and inexcusable, and (b) the alleged infringer suffered material prejudice attributable to the delay."  *Id.*  Because laches is an equitable defense, the "district court should consider these factors and all of the evidence and other circumstances to determine whether equity should intercede to bar pre-filing damages."  *Id.*

The length of time deemed "unreasonable has no fixed boundaries, but instead depends on the circumstances."  *Id.* at 1032.  Courts presume "laches arises where a patentee delays bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity."  *Id.*  This time period is measured beginning from when a patentee knows or reasonably should know about the infringement.  *Id.* at 1035.  This presumption shifts the burden to the patentee to present evidence rebutting laches.  *Id.* at 1032.  If the defendant presents proof of the patentee's actual or constructive knowledge of the defendant's alleged infringement and a six year lapse of time, the defendant has presented a *prima facie* defense of laches.  *Id.* at 1037.  If the patentee presents evidence sufficient to create a genuine dispute as to a factual element of the laches defense—that is, "that the patentee's delay was reasonable or that the defendant suffered no prejudice"—the presumption is overcome, or in other words, "destroy[ed] . . . in its entirety."  *Id.* at 1038.  That is not to say the defense of laches is defeated, but instead that the accused infringer is back to square one and must build its laches defense from the ground up.  *See id.*  Even when the presumption is in place, the defendant still bears the burden of persuasion.  *See id.* at 1038–39.

/ / /

/ / /

A patentee's delay is in some instances justified. *Id.* Justifications include, among other things, "other litigation . . . ; negotiations with the accused . . . ; extent of infringement . . . ; and dispute over ownership of the patent . . . ." *Id.*

The defendant meets the second element by showing either economic or evidentiary prejudice. *Id.* at 1033. Evidentiary prejudice arises if the defendant's ability to present a full and fair defense on the merits is hindered because of the "loss of records, the death of a witness, or the unreliability of memories of long past events," all of which undermine "the court's ability to judge the facts." *Id.* Economic prejudice exists "where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Id.* Economic prejudice must typically be linked to a change in the accused infringer's economic position during the period of delay rather than simple damages flowing from liability. *Id.* An accused infringer does not need to prove a complete loss of value in an investment to show economic prejudice, but must show a "change of economic position flowing from actions taken or not taken by the patentee." *Aspex Eyewear*, 605 F.3d at 1312 (citing *ABB Robotics*, 52 F.3d at 1065)

"On the other hand, this does not mean that a patentee may intentionally lie silently in wait watching damages escalate," especially where the accused infringer could have switched to a noninfringing product. *Id.* Additionally, there must be some causal link or "nexus" between the change in the accused infringer's economic position and the patentee's delay. *See Gasser Chair Co.*, 60 F.3d at 775. For example, where the accused infringer makes "a deliberate business decision to ignore [a] warning, and to proceed as if nothing had occurred," the causal link between the delay and the prejudice cannot support a finding of laches. *See id.* (holding that such a causal link was lacking where the accused infringer "was indifferent to whether [the patentee] would sue because of his personal belief that the patent was invalid").

In the end, laches is discretionary even if the defendant establishes the elements, and the court must "look to all the facts and circumstances of the case and weigh the equities of the parties." *Id.* at 773.

14

**B.      Analysis**

      **(i)      *Effect of Review of SCA Hygiene***

ThermoLife urges the Court to again deny GNC's MSJ without prejudice in light of the Supreme Court's decision to review the Federal Circuit's recent case affirming the existence of a laches defense in patent law.  (Opp'n at 26 (citing *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 807 F.3d 1311, 1316 (Fed. Cir. 2015), *cert. granted,* 136 S. Ct. 1824 (2016)).)  The Court declines to delay again a decision on the merits of GNC's laches defense, this time because of the possibility that the law might change.  If the law changes before judgment is entered in this case, ThermoLife may request reconsideration of this Order pursuant to the Court's inherent power to modify interlocutory orders.  *See Senza-Gel Corp. v. Seiffhart*, 803 F.2d 661, 663 (Fed. Cir. 1986).

      **(ii)      *Presumption of Laches***

The presumption of laches applies to the '459 Patent, the '872 Patent, and the '006 Patent because UT threatened to assert each against GNC more than six years before ThermoLife filed suit.  The question with respect to these patents therefore becomes whether ThermoLife can identify evidence sufficient to create a genuine factual dispute as to whether UT's delay was reasonable or whether GNC suffered prejudice.

Laches applies with respect to products that are "the same or similar" to those that gave the patentee knowledge or constructive knowledge of the infringement.  *See Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1295 (Fed. Cir. 2008).  For a change in product to trigger a new laches period, there "must be a change that is material to the case."  *Thomas v. Echostar Satellite L.L.C.*, No. 305CV494, 2006 WL 3751319, at *7 (W.D.N.C. Dec. 19, 2006) (citing *Intertech Licensing Corp. v. Brown & Sharpe Mfg. Co.*, 708 F. Supp. 1423, 1435–37 (D. Del. 1989)); *see also Lautzenhiser Techs., LLC v. Sunrise Med. HHG, Inc.*, 752 F. Supp. 2d 988, 1006 (S.D. Ind. 2010) (granting summary judgment after concluding that patentee alleged "infringing acts of the same nature" for functionally equivalent products launched on different dates).

/ / /

1    The accused products are, for purposes of infringement analysis, functionally
2    equivalent to the predecessor products about which UT sent its patent enforcement letters.
3    GNC demonstrates the absence of a dispute of fact on this point based on ThermoLife's
4    Complaint, (*see, e.g.*, Am. Compl. ¶¶ 18–20, ECF No. 122), and ThermoLife's
5    Infringement Contentions, (*see* Reply at 7–8).   For example, in its infringement
6    contentions, ThermoLife accuses all of the later-developed products of infringing claim 1
7    of the '459 Patent.  (Bentz Decl., Ex. L, ECF No. 190-6, at 11–20.)  This claim is also
8    asserted against the earlier-developed products. (*See id.*)  ThermoLife accuses four of the
9    eight later-developed products of infringing claim 12 of the '872 Patent, which is also
10   asserted against ArginMax, a product first marketed in 2001.  (*Id.*)   ThermoLife also
11   accuses six of the later-developed products of infringing claims 1, 2, or both of the '006
12   Patent.  (*Id.*)  These claims are also alleged against Mega Men Sport, first marketed in
13   2006, and ArginMax.  (*Id.*)

14   ThermoLife does not argue these products are not functionally equivalent, but
15   instead makes the legal argument that a product-by-product inquiry is required.  (*See* Opp'n
16   at 11–13.)  The patent enforcement letters were not product specific, but referred to the
17   basic functionality of the products.  In its May 2001 letter, for example, UT pointed out
18   that its patents were "directed generally to the use of L-arginine to improve vascular
19   function," and that GNC was "advertising products that contain L-arginine as a main
20   ingredient and that purportedly improve vascular function." (*See* Bentz Decl., Ex. H, ECF
21   No. 190-5, at 28.)   Based on how UT approached GNC's products and how ThermoLife
22   has conducted this case so far, the Court concludes that the later-developed products are
23   functionally equivalent to the earlier-developed ones, such that the presumption of laches
24   applies to all of the accused products.

25   The presumption of laches does not apply, however, to the '916 Patent because it
26   did not even exist for six years prior to ThermoLife's filing suit.  *See Lautzenhiser Techs.,*
27   *LLC v. Sunrise Med. HHG, Inc.*, 752 F. Supp. 2d 988, 1000 (S.D. Ind. 2010) ("Where, as
28   here, more than one patent is asserted, laches must be shown separately for each patent.").

Accordingly, the presumption of laches applies to the '459 Patent, the '872 Patent, and the '006 Patent.

### (iii)   *Delay*

With respect to the '459 Patent, the '872 Patent, and the '006 Patent, the Court begins with the presumption that laches applies and UT's delay was unreasonable, thereby placing the burden on ThermoLife to identify evidence sufficient for a fact finder to conclude that the delay was excusable or reasonable.

In its argument that the delay was reasonable, ThermoLife attacks GNC's reliance on the 2008 SEC filing, emphasizing that GNC was not even aware of the filing at the time. This argument fits curiously into the laches analysis, as the focus should be on the reasonableness of UT's delay, not whether GNC knew about certain conduct related to UT's delay.  ThermoLife goes on to argue that UT's statement in the SEC filing that UT was going to get out of the L-arginine market should have signaled that UT was planning to surrender its patent licenses with Stanford, and presumably that another entity—like ThermoLife—might come along, license the patents, and enforce them against GNC.  The Court is not convinced that this inference, even if justifiable, would support the notion that the subsequent delay was reasonable.  After all, UT held on to these patent licenses with Stanford for another four years after making this statement in its 10-K.  In any event, the inference ThermoLife urges is not justifiable.

Thus, ThermoLife has not presented evidence sufficient to support the notion that the delay in bringing suit, which ranges from thirteen years to seven years depending on the patent, was reasonable or excusable.   Accordingly, the Court concludes that ThermoLife has not overcome the presumption of laches with respect to the unreasonable delay element.

### (iv)   *Prejudice*

The Court again begins with the premise that the presumption of laches applies to the '459 Patent, the '872 Patent, and the '006 Patent, and therefore presumes the existence of evidentiary prejudice.

GNC avers that it has suffered evidentiary prejudice because the delay in enforcement of these patents makes it difficult or impossible to discover key facts. (MSJ at 22.) For example, the attorney who prosecuted the '872 Patent, Bertram Rowland, died in October 2010, (Bentz Decl., Ex. Q, ECF No. 186-9, at 115–16), and Mr. Rowland was a "key witness for GNC's inequitable conduct defense," (MSJ at 22.) Additionally, many GNC employees have left the company as time has worn on, "including several key individuals who were greatly involved in the research, development, and marketing of GNC's L-arginine product lines, including: Joe Weiss, VP of Wellness; Tim Bently, VP of Vendor Relations; and Joe Bresse, VP of Product Development." (MSJ at 23.) Many GNC employees who would have been involved in decisions about whether to stop marketing GNC's L-arginine products in response to UT's letters have left the company, hampering GNC's ability to say "whether there was ever a discussion of UT and the arginine patents while GNC was deciding to invest in the product category." (*Id.*; *see also* Butera Decl. ¶ 37, ECF No. 190-1, at 7.) Additionally, Dr. Maxwell, one of the inventors of the '872 Patent, has "limited recollection of several facts that are pertinent to the claims and defenses," such as the studies and experiments surrounding invention, the first disclosure of the invention, the origins of the concept, and the prosecution of the patent application. (MSJ at 23; Bentz Decl., Ex. B, ECF No. 186-6, at 8–9, 13, 15–16, 19, 36–37.)

Because laches is presumed, it is ThermoLife's burden to present evidence that GNC has not suffered evidentiary prejudice. ThermoLife notes that David Sullivan has been GNC's in-house counsel since 1993 and is "responsible for managing and responding to patent-related issues," and that Mark Butera "has been GNC's manager or director of merchandising since 2006 . . . ." (Opp'n at 24.) ThermoLife points to these witnesses' ability to recall information as representatives of GNC at its Rule 30(b)(6) depositions. (*See id.*) ThermoLife further argues that the death of a patent prosecution attorney and inability of an inventor to recall facts from well over a decade ago "are not the type of 'evidentiary prejudice' factors used to demonstrate laches, and GNC does not demonstrate

/ / /

1  that any facts related to any of these witnesses could not be accessed by way of still-

2  available documents and testimony." (*Id.*)

3        ThermoLife's argument that these are not the right type of factors to show

4  evidentiary prejudice is unconvincing.  The legal standard courts routinely recite to define

5  evidentiary prejudice lists "the death of a witness, or the unreliability of memories of long

6  past events" as quintessential types of evidentiary prejudice.  *See, e.g.*, *Aukerman*, 960 F.2d

7  at 1053; *I/P Engine, Inc. v. AOL Inc.*, 915 F. Supp. 2d 736, 743 (E.D. Va. 2012).  As stated

8  in one of the cases ThermoLife cites to advance this argument, the patentee "bore the

9  burden of showing a lack of both evidentiary and economic prejudice," but the patentee's

10  "brief speaks primarily of [the accused infringer's] failure to offer proof."  *Wanlass v. Gen.*

11  *Elec. Co.*, 148 F.3d 1334, 1340 (Fed. Cir. 1998).  The same is true here.  The presumption

12  of laches, including prejudice, has attached, and ThermoLife has offered inadequate

13  evidence to rebut the presumed prejudice.  Even assuming Mr. Sullivan and Mr. Butera are

14  able to adequately recall facts relevant to GNC's defense of this action, other facts—

15  particularly facts pertinent to the validity of the asserted patents—lie outside the memories

16  of both GNC employees, who speak mainly to GNC's internal activities.  ThermoLife's

17  arguments therefore attack only one aspect of the evidentiary prejudice alleged, leaving

18  other aspects free from any factual challenge.

19        Accordingly, ThermoLife has not rebutted the presumption of evidentiary prejudice

20  with respect to the '459 Patent, the '872 Patent, and the '006 Patent.

21        **C.   *Laches as to the '916 Patent***

22        Although GNC is not entitled to a presumption of laches with respect to the '916

23  Patent, it has nonetheless established that it is entitled to the laches defense as a matter of

24  law.  ThermoLife focuses its argument against laches on UT's 2008 10-K, emphasizing

25  that GNC was not aware of that statement and suggesting that UT's delay was reasonable

26  because it was timid about "raising the specter of litigation."  (Opp'n at 27 (quoting

27  *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09-290, 2014 WL 183212 (W.D.

28  Pa. Jan. 14, 2014)).)

After the '916 Patent issued in late 2008, UT did not assert the patent or contact GNC about licensing it for the four years during which UT continued to license Stanford's L-arginine patents. The sensible conclusion was that if UT was not going to assert its other L-arginine patents, it was not going to assert the '916 Patent either. The 2008 10-K, irrespective of GNC's knowledge of it, is evidence that UT had no intention of enforcing these patents. That lax approach to its patent rights was born out by the fact that UT never actually attempted to enforce these patents.

In much the same way as discussed above, GNC will suffer evidentiary prejudice because of the delay. It is true that memories and records related to the prosecution history and invention of the '916 Patent are much fresher than for the other patents, but recollections and records are still inexcusably four to five years more stale than they would have been if UT had pursued its patent rights diligently. Further, the 2010 death of the prosecuting attorney for the '872 Patent could have affected GNC's defense against the '916 Patent. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288 (Fed. Cir. 2011) ("[T]he taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family."). Equipped with knowledge that GNC was active in the L-arginine supplement business and a history of correspondence with GNC regarding possible infringement of its L-arginine patents, there is no reason for GNC to have sat on its rights for the years after the patent issued. The Court draws all justifiable inferences in ThermoLife's favor on GNC's summary judgment motion. Based on the evidence now before it, however, the Court sees no reasonable inferences to be drawn to excuse UT's delay in enforcing the '916 Patent.

Thus, GNC has established the elements of laches as to the '916 Patent.

### D.   *Weighing the Equities*

Given the equitable nature of the laches defense, even after the accused infringer has established the elements of laches, the Court must weigh the equities in deciding whether to bar pre-suit damages. *See Gasser Chair Co.*, 60 F.3d at 773. ThermoLife urges

that, although UT's dilatory conduct may be imputed to it, the Court should nonetheless note the distinction between UT and the plaintiffs in the instant case. That is, the Court should recognize that ThermoLife and Stanford were diligent in enforcing their patent rights. (Opp'n at 13–14.) Stanford continued to pursue L-arginine supplementation patents while UT sat on its rights, including by prosecuting and obtaining the '916 Patent. For its part, ThermoLife filed suit the month after it licensed these patents. While ThermoLife and Stanford have shown some diligence with respect to these patents—ThermoLife more so than Stanford—these efforts do not outweigh the prejudice GNC has suffered as a result of the delay. Further, the different approaches by different licensors does not show that UT did not take an overly lax approach to its L-arginine patents, as relevant to laches, so much as it shows that UT was not attempting to mislead GNC, as relevant to equitable estoppel. Accordingly, the Court exercises its discretion to hold that laches bars pre-suit damages for infringement of the '916 Patent.

## III.   Unclean Hands/Egregious Conduct

Lastly, ThermoLife argues that, drawing all justifiable inferences in its favor, the record supports a finding of unclean hands against GNC, which would bar application of both equitable estoppel and laches.

"In advancing the egregious conduct/unclean hands argument to rebut a presumption of laches, plaintiff bears the burden of proof." *Intertech Licensing Corp.*, 708 F. Supp. at 1439 (citing *Bott v. Four Star Corp.*, 807 F.2d 1567, 1576 (Fed. Cir. 1986)). To establish egregious conduct, a patentee must make a "showing of some exceptional character, 'such as where the one asserting the defense of laches was responsible for the plaintiff's delay, or allayed the plaintiff's suspicion through deception,' . . . or 'evidence of wilful misconduct or fraud on the part of defendant.'" *Id.* (quoting *Coleman v. Corning Glass Works*, 619 F.Supp. 950, 955 (W.D.N.Y. 1985), *aff'd*, 818 F.2d 874 (Fed. Cir. 1987); *Lemelson v. Carolina Enters., Inc.*, 541 F.Supp. 645, 654 n.25 (S.D.N.Y. 1982)).

Although GNC admitted that it does not conduct a patent search before determining whether products it might launch infringe on any existing patents, (Opp'n at 29; Woods

Decl., Ex. B, ECF No. 195-1, at 12–13), the conduct ThermoLife identifies falls well short of the egregious conduct necessary to make a prima facie showing sufficient to preclude these equitable defenses.  ThermoLife has not pointed to evidence that could demonstrate that GNC's failure to identify these patents before launching its products or its continued marketing based on its noninfringement position were sufficiently reprehensible to overcome laches.  *See Intertech Licensing Corp.*, 708 F. Supp. at 1439 (concluding that conduct that was ultimately found to infringe is not on its own "egregious" as required to overcome the laches defense).  Nor has ThermoLife identified evidence that UT's delay was GNC's fault or that GNC acted deceptively.  Accordingly, the Court rejects ThermoLife's unclean hands/egregious conduct argument.

## CONCLUSION

For the reasons stated above, the Court **DENIES** GNC's MSJ with respect to equitable estoppel and **GRANTS** GNC's MSJ with respect to laches.  Based on Plaintiffs' laches, they may not recover from GNC damages that accrued for infringement of the patents in suit before this action was filed.

**IT IS SO ORDERED.**

Dated:  June 28, 2016

Hon. Janis L. Sammartino
United States District Judge

22

13cv651 JLS (MDD)
(LEAD CASE)