Tyler J. Woods (SBN 232464)
twoods@trialnewport.com
Richard H. Hikida (SBN 196149)
rhikida@trialnewport.com
Scott J. Ferrell (SBN 202091)
sferrell@trialnewport.com
NEWPORT TRIAL GROUP
4100 Newport Place, Suite 800
Newport Beach, CA 92660
Telephone: (949) 706-6464
Facsimile: (949) 706-6469

Attorneys for Plaintiffs
THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR UNIVERSITY
and THERMOLIFE INTERNATIONAL, LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERMOLIFE INTERNATIONAL, LLC<br><br>            Plaintiff,<br><br>            v.<br><br>MYOGENIX CORP., et al.<br><br>            Defendants.<br><br>————————————————<br>AND RELATED CASES | CASE NO.: 13-cv-651 JLS (MDD)<br>            (LEAD CASE)<br><br>**PLAINTIFFS THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY AND THERMOLIFE INTERNATIONAL, LLC'S MEMORANDUM IN OPPOSITION TO THE MOTION FOR ATTORNEYS' FEES OF DEFENDANTS VITAL PHARMACEUTICALS, INC. AND HI-TECH PHARMACEUTICALS, INC.**<br><br>Hearing Date: January 5, 2017<br>Time: 1:30 p.m.<br>Judge: Hon. Janis L. Sammartino<br>Courtroom: 4A |

1

2

## <u>**TABLE OF CONTENTS**</u>

I.    INTRODUCTION ..............................................................................................1

3

II.   LEGAL ARGUMENT .......................................................................................2

4

5

      A.   Plaintiffs' Pre-Filing Infringement Investigation Was More Than
          Adequate, and Defendants Are Not Entitled to a Post-Trial Ruling of
          Non-Infringement ....................................................................................3

6

7

          1.   Hi-Tech's Infringing Products...................................................10

8

          2.   VPX's Infringing Products .......................................................14

9

      B.   Stanford and ThermoLife are Not "Patent Trolls" and Nothing About
          This Case was "Exceptional" ..................................................................18

10

III.  CONCLUSION .................................................................................................21

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adaptix, Inc. v. Apple, Inc.*,
 Case No. 5:13-cv-01776-PSG, 2015 WL 5158716 (N.D. Cal. Sep. 2, 2015) ...................................9

*Allen Engineering Corp. v. Bartell Industries, Inc.*,
 299 F.3d 1336 (Fed. Cir. 2002) ....................................................................8

*Baratto v. Brushstrokes Fine Art, Inc.*,
 2010 WL 4439034 (W.D. Wis. 2010) ..........................................................4

*Cognex Corp. v. Microscan Sys., Inc.*,
 No. 13–2027, 2014 WL 2989975 (S.D.N.Y. June 30, 2014) .........................2

*Computer Software Protection, LLC v. Adobe Systems Incorporated*,
 Civ. No. 12-451, 2015 WL 1517402 (D. Del. Mar. 31, 2015) ......................5

*CreaAgri, Inc. v. Pinnaclife, Inc.*,
 2014 WL 2508386 (N.D. Cal. 2014) .............................................................6

*Digital Reg of Texas, LLC v. Adobe System, Inc.*,
 Case No. 12-1971, 2014 WL 4090550 (N.D. Cal. Aug. 19, 2014) ..............18

*Digitech Image Technologies, LLC v. Newegg, Inc.*,
 Case No. 8:12-cv-01688, 2013 WL 5604283 (C.D. Cal. Oct. 11, 2013) ......19

*EON Corp. IP Holdings, LLC v. FLO TV Incorporated*,
 2014 WL 2196418 (D. Del. 2014)..................................................................5

*Eon-Net LP v. Flagstar Bancorp*,
 653 F.3d 1314 (Fed. Cir. 2011) (VPX's Br. and Hi-Tech's Br. [ECF No. 253-1 of
 16]) ..............................................................................................................20

*F.T.C. v. John Beck Amazing Profits, LLC*,
 865 F. Supp. 2d 1052 (C.D. Cal. 2012) .......................................................12

*F.T.C. v. National Urological Group*,
 Civil Action No. 1:04-CV-3294, 2014 WL 3893796 (N.D. Ga. May 14, 2014),
 reversed and remanded on other grounds, 785 F.3d 477 (11th Cir. 2015).....13

*Finjan, Inc. v. Sophos, Inc.*,
 Case No. 14-cv-01197, 2016 WL 4560071 (N.D. Cal. Aug. 22, 2016).........18

*Gametek LLC v. Zynga, Inc.*,
 CV 13-2546 RS, 2014 WL 4351414 (N.D. Cal. Sept. 2, 2014) ......................2

*GeoTag, Inc. v. Zoosk, Inc.*,
  Case No. C-13-0217, 2014 WL 793526 (N.D. Cal. Feb. 26, 2014) ................................20

*GoDaddy.com LLC v. RPost Communications Limited*,
  No. CV-14-00126, 2016 WL 4569122 (D. Ariz. Sep. 1, 2016) ....................................19

*H-W Tech., Inc. v. Overstock.com, Inc.*,
  3:12-CV-0636-G BH, 2014 WL 4378750 (N.D. Tex. Sept. 3, 2014) ...............................2

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
  134 S. Ct. 1744 (2014) ............................................................................3

*Icon Health & Fitness, Inc. v. Octane Fitness, LLC*,
  2011-1521, 2014 WL 4194609 (Fed. Cir. Aug. 26, 2014) ................................2, 3, 6, 20

*Intellect Wireless, Inc. v. Sharp Corp.*,
  No. 10–6763, 2014 WL 2443871 (N.D. Ill. May 30, 2014) ..........................................2

*IPVX Patent Holdings, Inc. v. Voxernet, LLC*,
  Case No. 5:13-cv-01708, 2014 WL 2772297 (N.D. Cal. June 18, 2014) ........................20

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GMBH et als.*,
  603 F.3d 943 (Fed. Cir. 2010) .....................................................................4

*Precision Links Inc. v. USA Products Group, Inc.*
  No. 08–576, 2014 WL 2861759 (W.D.N.C. June 24, 2014) ..........................................2

*Q-Pharma, Inc. v. Andrew Jergens Co.*,
  360 F.3d 1295 (Fed. Cir. 2004) .............................................................5, 6, 7

*Renta v. County of Cook*,
  735 F. Supp. 2d 957 (N.D. Ill. 2010) ..............................................................15

*Rothschild Connected Devices Innovations, LLC v. Guardian Protection Services, Inc.*,
  Case No. 2:15-cv-1431, 2016 WL 3883549 (E.D. Tex. July 18, 2016) ............................9

*S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*,
  781 F.2d 198 (Fed. Cir. 1986) ...................................................................2, 3

*SFA Sys., LLC v. Newegg, Inc.*,
  793 F.3d 1344 (Fed. Cir. 2015) ....................................................................20

*Snap-on Inc. v. Robert Bosch, LLC*,
  Case No. 09 CV 6914, 2016 WL 1697759 (N.D. Ill. Apr. 28, 2016) ...............................6

*Tawnsaura Group, LLC v. Maximum Human Performance, LLC*,
  Case No. CV 12-07189, 2014 WL 10473298 (C.D. Cal. Sep. 4, 2014) ............................6

*Trover Group, Inc. v. Dedicated Micros USA*,
  Case No. 2:13-CV-1047, 2015 WL 4910875 (E.D. Tex. Aug. 17, 2015) ...........................4

-iii-

*Tyco Healthcare Group LP v. Mutual Pharmaceutical Company, Inc.*,
   Civil Action No. 07-cv-1299, 2016 WL 3965201 (D.N.J. July 22, 2016) .........................................4

*View Engineering, Inc. v. Robotic Vision Systems, Inc.*,
   208 F.3d 981 (Fed. Cir. 2000) (VPX's Br. ) ...................................................................................5, 6

*Yufa v. TSI Inc.*,
   Case No. 09-cv-01315, 2014 WL 4071902 (N.D. Cal. Aug. 14, 2014) ............................................6

**Federal Regulations**

21 C.F.R. § 101.36(b)(2) and (c) ........................................................................................................16

21 C.F.R. § 111.75(c) and (d) ...............................................................................................................9

**Federal Rules**

Rule 11 ...................................................................................................................................................1

## I.     INTRODUCTION

Plaintiffs The Board of Trustees of the Leland Stanford Junior University ("Stanford") and ThermoLife International, LLC ("ThermoLife") oppose the unfounded motions for attorneys' fees filed by Defendant Vital Pharmaceuticals, Inc. ("VPX") and Hi-Tech Pharmaceuticals, Inc. ("Hi-Tech") (collectively "Defendants")[1].  At their core, the motions are grounded in what amounts to a motion for summary judgment on non-infringement, as Defendants basically seek declaratory judgments, without allowing for any discovery whatsoever, that their products, as a matter of law, do not infringe the patent claims the Court has found invalid.  This is completely contrary to the bifurcated nature of this case, where the issue of invalidity – on which Defendants prevailed – preceded questions of infringement, which were never reached.  Indeed, Defendants fail to cite any legal authority supporting the proposition that a party can be held liable for fees because it advanced an infringement position that has never actually been found incorrect.  Defendants cannot now "jump the line" and relitigate their non-infringement position in a case that was bifurcated at their request and is now closed.  And even if they could, Defendants' non-infringement arguments are meritless.[2]

Defendants' secondary argument – that Plaintiffs are somehow "patent trolls" and engaged in this consolidated litigation in bad faith – is as meritless as Defendants' non-infringement argument.   The fact that the sheer number of infringers of Stanford's patent portfolio necessitated separate suits against each one under the America Invents Act and its non-joinder provisions is not a reason to punish Plaintiffs.  Indeed, rather than gracefully acknowledge their hard-fought win on invalidity after a lengthy trial leading to a 46-page written decision, Defendants pejoratively diminish Plaintiffs'

---

[1] The fact that the GNC defendants have not moved for attorneys' fees is telling.  Apparently they do not share their colleagues' view on the exceptionality of this case, even though they prevailed in their motion for summary judgment with respect to laches.  ECF No. 213 (Order, dated June 28, 2016)

[2] If Defendants thought Plaintiffs' infringement case was meritless from day one, they likely would have sent Rule 11 notices at some point in the last three-and-a-half years, rather than wait until the case was closed to launch such an attack on issues that were never litigated on the merits.

1   exercise of their constitutional right to enforce the patents-in-suit to the tactics of a

2   "patent troll," which Plaintiffs are definitely not.  Defendants' attempt to declare this

3   case exceptional should therefore be rejected.

4   **II.     LEGAL ARGUMENT**

5        "[P]ost-*Octane* decisions awarding fees have concerned egregious behavior."

6   *Gametek LLC v. Zynga, Inc.*, CV 13-2546 RS, 2014 WL 4351414, *3 (N.D. Cal. Sept.

7   2, 2014); *see also*, *e.g.*, *Intellect Wireless, Inc. v. Sharp Corp.*, No. 10–6763, 2014 WL

8   2443871, at *6 (N.D. Ill. May 30, 2014) (awarding fees based on false declarations

9   before the PTO, without which, the court concluded, the plaintiff would not have

10  obtained the patents at issue); *Cognex Corp. v. Microscan Sys., Inc.*, No. 13–2027, 2014

11  WL 2989975, at *4 (S.D.N.Y. June 30, 2014) (criticizing plaintiff for post-trial motions

12  that simply sought to re-litigate issues decided during trial and awarding fees at least as

13  to those motions); *Precision Links Inc. v. USA Products Group, Inc.* No. 08–576, 2014

14  WL 2861759, at *3 (W.D.N.C. June 24, 2014) (criticizing plaintiff for seeking a

15  preliminary injunction based in large part on a previously-rejected theory of liability

16  and filing frivolous post-dismissal motions).  "Courts deciding whether to award fees in

17  patent cases engage in a two-step analysis." *H-W Tech., Inc. v. Overstock.com, Inc.*,

18  3:12-CV-0636-G BH, 2014 WL 4378750, *3 (N.D. Tex. Sept. 3, 2014) (citing

19  *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1467–68 (Fed. Cir. 1997);

20  *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1370 (Fed. Cir. 2004)).  "They first

21  determine whether the case is 'exceptional'; if so, then they determine whether an

22  award of attorneys' fees is appropriate." *Id.*  "The Supreme Court's decision in *Octane*

23  did not . . . revoke the discretion of a district court to deny fee awards even in

24  exceptional cases." *Icon Health & Fitness, Inc. v. Octane Fitness, LLC*, 2011-1521,

25  2014 WL 4194609, *3 (Fed. Cir. Aug. 26, 2014).  "Even an exceptional case does not

26  require in all circumstances the award of attorney fees." *S.C. Johnson & Son, Inc. v.

27  Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986).  The Court should consider

28  "the closeness of the case, the tactics of counsel, the conduct of the parties, and any

-2-

other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser." *Id.*

Defendants have not established that this case is that very rare type of case that "stands out from the others" based on either: (1) "the substantive strength of [Plaintiffs'] litigating position (considering both the governing law and the facts of the case)" or (2) "the unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S. Ct. 1749, 1756 (2014). In the two leading Supreme Court decisions on the subject of exceptional cases, for example, the facts were far more egregious. *See id.* at 1755 (noting evidence that the patentee improperly "brought the infringement action 'as a matter of commercial strategy'"); *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1747-48 (2014) (noting that the district court had found that the patentee's conduct was objectively unreasonable in light of evidence that the patentee "maintained infringement claims [against Highmark] well after such claims had been shown by its own experts to be without merit" and had "asserted defenses it and its attorneys knew to be frivolous."). No such unreasonable and exceptional conduct exists in this case.

## A. Plaintiffs' Pre-Filing Infringement Investigation Was More Than Adequate, and Defendants Are Not Entitled to a Post-Trial Ruling of Non-Infringement

Early in this case, Defendants asked the Court for this case to be bifurcated – first, as to the consolidated common issues of claim construction, invalidity, unenforceability, and inequitable conduct; and, second, with respect to the defendant-specific issues relating to infringement and damages. *See* ECF No. 21, Aug. 16, 2013 (Plaintiff and Defendants' Joint Response to July 19, 2013 Order to Show Cause Why These Cases Should Be Consolidated For Pretrial Purposes Up To and Including Claim Construction). Defendants have prevailed on the common issue of invalidity, but only after a week-long trial after which the Court noted: "Although the Court finds both experts to be generally credible, as discussed below, the Court in some instances finds

the testimony of one expert or the other more entitled to greater weight or certain aspects of the expert's testimony less credible." ECF No. 242, Sep. 29, 2016 (Decision and Order). This ruling came only after several losses by Defendants along the way, for instance:

-    the Court adopted virtually across the board Plaintiffs' proposed claim constructions, including multiple findings that the "Court agrees with Plaintiff" (ECF No. 109 at 7, 9, 11, 13, and 15);

-    the Court denied Defendants' Motion for Summary Judgment of Invalidity, finding, for instance, that "Defendants have not shown the highly skilled artisan in the field relevant to these patents would have had a reason to combine the references Defendants cite" (ECF No. 155 at 36); and

-    the Court denied Defendants' Motion for Judgment on the Pleadings, noting that "One wonders how the Moving Defendants could expect the Court to adjudicate their invalidity motion while, as they now contend, the Court lacked subject-matter jurisdiction to adjudicate the dispute against them" (ECF No. 183 at 9).[3]

Courts presume that parties act in good faith in alleging infringement of duly granted patents. *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GMBH et als.*, 603 F.3d 943, 954 (Fed. Cir. 2010); *Baratto v. Brushstrokes Fine Art, Inc.*, 2010 WL 4439034, *6-*7 (W.D. Wis. 2010). Victorious on their patent invalidity claims, Defendants seek to now have the Court also find them

---

[3]   Indeed, if the Court would have ruled for Plaintiffs after the validity trial, which revolved mostly around expert testimony, Plaintiffs would likely not have had solid grounds to move for an exceptional case finding. *Tyco Healthcare Group LP v. Mutual Pharmaceutical Company, Inc.*, Civil Action No. 07-cv-1299, 2016 WL 3965201, *4 (D.N.J. July 22, 2016) ("it would be inappropriate to find this case to be exceptional based on the 'battle of the experts' the parties conducted…."). That the Court ultimately chose one expert over the other does not make a case "exceptional." *Accord Trover Group, Inc. v. Dedicated Micros USA*, Case No. 2:13-CV-1047, 2015 WL 4910875, *4 (E.D. Tex. Aug. 17, 2015) ("[t]he fact that plaintiffs lost that [claim construction] battle in this case does not by itself render their conduct sanctionable").

victorious on their non-infringement defenses, basically seeking to ignore the bifurcated nature of this action.  In essence, Defendants are asking for a declaration that they have prevailed on an issue (non-infringement) that has not even been litigated, much less one they have prevailed on.  This premature and purely speculative approach should be rejected outright by the Court.  *See EON Corp. IP Holdings, LLC v. FLO TV Incorporated*, 2014 WL 2196418, *2 (D. Del. 2014) ("First, liability and damages were bifurcated in this case. No discovery has been conducted with respect to damages because the case was concluded at the summary judgment stage. Arguments by both sides regarding the size of the potential recovery are speculative and cannot form the basis for an award of attorney's fees"); *Computer Software Protection, LLC v. Adobe Systems Incorporated*, Civ. No. 12-451, 2015 WL 1517402, *2 (D. Del. Mar. 31, 2015) ("in a case where settlements were reached with other parties, and the court did not construe the claims, or resolve multiple discovery disputes, or resolve motions to dismiss or for summary judgment, to characterize these circumstances as exceptional is exceptionally presumptuous…").[4]

Defendants' arguments are premised on the assertion that Plaintiffs needed to "test" the accused products before bringing suit.  *See, e.g.*, VPX's Br. at 13; Hi-Tech's Br. at 2 (ECF No. 253-1 at 5 of 16).  Product testing is ***not*** required.  The Federal Circuit has ruled that in the context of a patent infringement action, the asserted patent claims must be interpreted and there must be a comparison between the accused device with those claims before filing a claim alleging infringement, but product testing is expressly ***not*** required.  *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300, 1302 (Fed. Cir. 2004).  The *Q-Pharma* Court even distinguished one of the cases Defendants rely on here - *View Engineering, Inc. v. Robotic Vision Systems, Inc.*, 208

---

[4] While VPX half-heartedly argues that Plaintiffs' mere receipt of Defendants' invalidity contentions in January 2015 was some kind of trigger date for this case to become "exceptional," VPX's Br. at 17, that assertion is groundless in light of the fact that the Court would go on to deny Defendants' motion for summary judgment on invalidity almost a year later.  Moreover, neither Defendant has provided any detail regarding how the alleged attorneys' fees were calculated or from what point forward.

F.3d 981 (Fed. Cir. 2000) (VPX's Br. at 12) – on the grounds that in *View Engineering* the patentee did nothing more than review the alleged infringer's advertising, but in the *Q-Pharma* case, "Q-Pharma did not file suit based solely on Jergens' advertising; critically, it also relied on its own comparison of the asserted claims with the accused product." *Q-Pharma*, 360 F.3d at 1302.  The other case Defendants rely on heavily – *Yufa v. TSI Inc.*, Case No. 09-cv-01315, 2014 WL 4071902 (N.D. Cal. Aug. 14, 2014) – is even more distinguishable, in that "even a pro se litigant with Dr. Yufa's knowledge and experience should have known that he had no admissible evidence to support his claims of infringement rendering his lawsuit objectively baseless. Instead of voluntarily dismissing his lawsuit, Dr. Yufa continued to litigate his case without any admissible evidence."  Both *View Engineering* and *Yufa* do nothing to advance Defendants' arguments; in fact, the cases undercut Defendants' position here, as in those cases, the issue of non-infringement was fully adjudicated on summary judgment motions, where as in the instant case, Defendants' assertions of non-infringement have not been tested, fully briefed, or subject to full discovery, including expert discovery.  None of Defendants' cases seem to involve decisions in which a court awarded fees due to a plaintiff advancing arguments on an issue that did not reach judgment.

  *Octane Fitness* has not changed the fact that Courts deny motions for an exceptional case finding even though the patentee did not physically test the product before suing.  *See, e.g., CreaAgri, Inc. v. Pinnaclife, Inc.*, 2014 WL 2508386 (N.D. Cal. 2014); *Snap-on Inc. v. Robert Bosch, LLC*, Case No. 09 CV 6914, 2016 WL 1697759 (N.D. Ill. Apr. 28, 2016); *Tawnsaura Group, LLC v. Maximum Human Performance, LLC*, Case No. CV 12-07189 (AGRx), 2014 WL 10473298, *3 (C.D. Cal. Sep. 4, 2014) ("a potential plaintiff would not act unreasonably by relying on potential defendants' representations on the labels of their products to determine likelihood of infringement before filing a complaint).  While Defendants cite to Mr. Kramer's deposition for the fact that Plaintiffs reviewed Defendants' marketing claims and ingredients, *see* VPX's Br. at 2, they fail to present to the Court the deposition testimony pertaining to the rest

of the analysis Plaintiffs engaged in (*i.e.*, Plaintiffs compared the asserted claims with the accused products).  *See, e.g.*, Dep. Tr. of Kramer, 133:21-24, 134:10-11 ("In some products a very small amount would be an infringement on some patents, and in some patents another dose would be an infringement….Each of the claims in each of the patents had different doses").  The requirement of *Q-Pharma* of interpreting the claims and comparing them with the accused devices was more than satisfied in this case.

As to how the allegedly infringed claims should have been interpreted, Defendants' non-infringement arguments are largely premised on the false assertion that claim 1 of patent '459 specifically requires a dose of 1 gram of arginine.  *See* VPX's Br. at 4 and Hi-Tech's Br. (ECF No. 253-1) at 3.  They cite to the '459 Patent at column 6, lines 15-22 for that 1 gram proposition, but that reference says ***nothing*** about 1 gram.  If anything, the patent describes the general low dosage amount of 500 milligrams.  *See* '459 Patent at 10:2-4 ("For formulations as dietary supplements, individual dosages will generally range from about 0.5 to 5 g...").  But there was never any *requirement* stated in the patent for a dosage amount, despite Defendants' assertions otherwise, and the Court never construed the '459 Patent's claims to require one gram of arginine.  This issue would have certainly been addressed later, had the case advanced forward to the infringement phase, which could have included consideration of the doctrine of equivalents.

Moreover, Defendants erroneously cite to ThermoLife's expert as claiming that "at least one gram of L-Arginine or L-Arginine hydrochloride would have been required for infringement of the '459 patent."  Hi-Tech's Br. (ECF No. 253-1) at 3; *see also* VPX's Br. at 4 ("ThermoLife's own expert, Dr. Rainer Boger, at his deposition (and again at trial), testified that at least 1 gram of L-arginine or L-arginine hydrochloride is required to infringe claim 1 the '459 patent)."  The questions posed to Dr. Boger at his deposition and at trial were ***never*** about what was required for infringement of the '459 Patent – Dr. Boger was discussing what was learned ***after*** the issuance of the patent.  *See, e.g.*, Exhibit H to DiGiovanni Decl., Dkt. 246-10, at Exhibit H, 253:7-13 ("all the

studies that were performed after Dr. Cooke's initial study and that showed an increase in nitric oxide utilized doses higher than 1.5 to 2 grams per day in a chronic dosing, whereas several studies that have been published and claimed that L-arginine is ineffective in increasing nitric oxide were using doses of 1 to 1.5 grams and below") [emphasis added]; and *id.* at Exhibit I, 460:4-5 (answering counsel's questions about arginine dosing "from today's point of view and from any time point after the disclosures of the Cooke patent"). Had the parties reached the infringement phase of the case, this issue certainly would have been parsed out further through a full-fledged infringement analysis and report in light of the proper construction of the claim at issue. *See Allen Engineering Corp. v. Bartell Industries, Inc.*, 299 F.3d 1336, 1351 (Fed. Cir. 2002) ("Infringement is determined by comparing the accused devices…with the claims of the patent as properly construed"). Under this proper standard, it is clear that Dr. Boger was never asked about, and he never testified about, what an infringing dose of arginine would have been at the time of the invention. His deposition and trial testimony, based on the time frames asked by Defendants' counsel, are actually irrelevant to the question of infringement – which is no surprise, as Dr. Boger was Plaintiffs' expert on validity, not on infringement. Crucially, Defendants have not brought forward any expert on the infringement issue

Defendant also argue that some of their products contain amino acids other than arginine or lysine as "active ingredients," and thus they could not infringe the '459 Patent. *See* VPX Br. at 13-14 and Hi-Tech's Br. at 7-8 (ECF No. 253-1 at 10 and 11 of 16). In a material omission, Defendants leave out the fact that while the Court construed the '459 Patent as requiring that "arginine and lysine cannot be active ingredients," *id.* at 13, the proper context for the question of what "active ingredients" are was also construed: "The Court finds, as it did in its discussion of the '872 patent, that applicants did not disclaim the inclusion of all other amino acids, but just the inclusion of active ingredient amino acids *for the purpose of bringing about the patent's intended benefit*." *See* ECF No. 109 (Claim Construction Order) at 16

(emphasis added). Because the intended benefit of the '459 Patent's asserted claim 1 is "improving vascular NO activity of the vascular system of a human host by enhancing endothelial NO," '459 Patent at 26:39-40, Defendants' non-infringement position by virtue of the inclusion of other amino acids can only be successful if they can show that the presence of these other amino acids could even possibly achieve the patent's intended benefit. Defendants have not even tried to do so – instead, they take the strategy of not providing the full context of the Court's construction of the '459 Patent.[5] Defendants' arguments related to the presence of other amino acids is not only wrong, but it is based on a material omission from the Court's claim construction.

Even if the Court would now engage in the detailed infringement analysis of products relative to patent claims it has already invalidated, extensive discovery would need to be taken, as the non-infringement positions Defendants assert, without any expert testimony, are wholly unsupported. *Adaptix, Inc. v. Apple, Inc.*, Case No. 5:13-cv-01776-PSG, 2015 WL 5158716, *3 (N.D. Cal. Sep. 2, 2015) ("Defendants cite no authority for the proposition that a patentee must accept the representations of an accused infringer and forego additional discovery based on those representations"); *Rothschild Connected Devices Innovations, LLC v. Guardian Protection Services, Inc.*, Case No. 2:15-cv-1431, 2016 WL 3883549, *2 (E.D. Tex. July 18, 2016) ("for a case dismissed before trial to be designated exceptional, evidence of the frivolity of the claims must be reasonably clear without requiring a 'mini-trial' on the merits for attorneys' fees purposes") (quoting *MacroSolve, Inc. v. Antenna Software, Inc.*, Case No. 6:11-cv-287, ECF No. 573 at 5 (E.D. Tex. Oct. 16, 2014), reconsideration denied, ECF No. 578, aff'd 637 Fed. Appx. 591 (Fed. Cir. 2016), cert. denied, 2016 U.S. LEXIS 3904 (U.S. June 13, 2016)). Nevertheless, Plaintiffs address both Defendants'

---

[5] The only amino acid Defendants list that could even theoretically be one that could impact nitric oxide is citrulline malate, but they have not even attempted to show (by way of the required finished product testing or other evidence) that the formulations provided enough citrulline malate to be capable of enhancing endothelial NO. *See* 21 C.F.R. § 111.75(c) and (d) ("…you must verify that your finished batch of the dietary supplement meets product specifications for identity, purity, strength, composition…")

respective non-infringement positions below.

### 1.    Hi-Tech's Infringing Products

In yet another omission, Hi-Tech fails to attach the Amended Infringement Contentions served on Hi-Tech, instead relying solely on the Infringement Contentions against VPX.  Hi-Tech's Br. at 2 (ECF No. 253-1 at 5 of 16).  This was purely by design, because Hi-Tech's motion looks only at one patent – the '459 Patent – and fails to mention at all that the other three patents-at-issue were also asserted against Hi-Tech as well.  *See* Declaration of Tyler J. Woods, Nov. 17, 2016 ("Woods Decl.") ¶ 2, Ex. A (Amended Infringement Contentions as to Hi-Tech).  Hi-Tech does not want the Court to appreciate that the infringement case against Hi-Tech was about much more than only the '459 Patent, and there is therefore no question that Plaintiffs' infringement case as to the other three patents ('872, '916, and '006 Patents) is not, and has never been, in dispute.

There was only one product – Anavar – alleged to infringe the '459 Patent only, and the other products were all alleged to infringe at least one other patent-at-issue.  *Id.* This fact is crucial, because Hi-Tech admits that Anavar's supplement facts panel did not reveal any facial non-infringement issues.  Hi-Tech's Br. at 8 (ECF No. 253-1 at 11 of 16).  In other words, Hi-Tech would have attacked the validity of the '459 Patent, even if the other four products it addresses in its motion were never eventually found to have infringed the '459 Patent, and thus, Hi-Tech cannot show that it spent any more on legal fees in attacking the '459 Patent's validity than it should have.

Of course, Hi-Tech's non-position as to Anavar is not surprising given the bombastic claims of Anavar with respect to arginine's effect on nitric oxide in the product:  "by utilizing the arginase inhibitors ABH and BEC, Anavar inhibits the arginase enzyme, and delivers arginine directly into muscle tissue.  This results in significantly more nitric oxide production than any other nitric oxide supplement…" *See* Woods Decl. ¶ 3, Ex. B; *see also* Woods Decl. ¶ 4, Ex. C ("Hi-Tech utilizes ABH

-10-

and BEC, the novel arginase inhibitors in Anavar, to flank the high dosage of L-arginine and to take arginase head-on by rendering it useless. This leaves an abundance of L-arginine uncompromised in the muscle pool to create a wealth of NO, leading to maximum muscular vasodilation"). These claims are important because they mirror closely with the comments Hi-Tech makes with respect to the four products[6] Hi-Tech discusses in its brief. For instance, as to NO Overload, the advertising states: "Hi-Tech Pharmaceuticals….utilizes a 'straight up the middle' approach by blasting high dosages of L-arginine into the bloodstream along with highly potent, arginase inhibitors that bond to arginase enzymes, which render these enzymes incapable of preventing L-arginine from uniting with NOS enzymes on their way to creating NO. This is a very novel pathway to NO production….." *See* Woods Decl. ¶ 6, Ex. E. As to Stamina-RX, Zencore Plus and SizeMatters, Hi-Tech boasts as to all three: "L-Arginine – Increases natural production of nitric oxide, leading to a more rigid erection." *See* Woods Decl. ¶ 7, Ex. F.

Hi-Tech cannot have it both ways. Hi-Tech cannot claim in its advertising that the arginine content of its products provide "high dosages" of arginine and increase "production of nitric oxide," yet rely on the assertion by Jared Wheat, Hi-Tech's President and CEO, that none of the products contain 1 gram or more of L-Arginine or L-Arginine hydrochloride. *See* ECF No. 253-2 at ¶ 5. This is particularly true as Hi-Tech argues, as noted above, that 1 gram is the magic number to enhance nitric oxide production. Thus, even if Mr. Wheat is being truthful in his Declaration (which would be in contradiction to his company's advertising statements), it does nothing to change the fact that non-infringement of the '459 Patent could never be "readily reveal[ed]"

---

[6] Hi-Tech mentions another product – Mesomorph – which was initially alleged to have infringed the '006 Patent, but then was dropped from the suit when Plaintiffs served their Amended Infringement Contentions three days after the Court rendered its claim construction ruling. *Compare* Woods Decl. ¶ 5, Ex. D (initial Infringement Contentions as to Hi-Tech) and ¶ 2, Ex. A (Amended Infringement Contentions as to Hi-Tech). The fact that Plaintiffs reevaluated their infringement case immediately following the Claim Construction Order is even further evidence of good faith of their litigation conduct in this matter.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR ATTORNEYS' FEES        13-cv-651 JLS (MDD)

1  from the labeling.  Hi-Tech's Br. at 8 (ECF No. 253-1 at 11 of 16).  Hi-Tech is being

2  hypocritical in arguing that Plaintiffs should not have relied on its labels before filing

3  suit, while contending that Plaintiffs should have known from the labels there was no

4  infringement.  In reality, the labels actually underscore infringement.

5  　　　　To the extent Hi-Tech argues that Plaintiffs should have completely ignored the

6  advertising statements but instead looked at only the supplement facts panel of the

7  products, given the bombastic claims as to the amount of arginine, the veracity of the

8  supplement facts panel would be called into serious question.  *F.T.C. v. John Beck*

9  *Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1065, 1071 (C.D. Cal. 2012)

10  (representations in advertising must be viewed as a whole) (citing *Donaldson v. Read*

11  *Magazine, Inc.*, 333 U.S. 178, 188 (1948)).  Besides, analyzing Hi-Tech's supplement

12  facts panels in isolation is generally a poor gauge of reality or legality, underscoring the

13  need to look at the full label and advertising of Hi-Tech's products, since Hi-Tech and

14  Mr. Wheat, on whose declaration Hi-Tech relies, have a history of being the subjects of

15  activities by federal regulators pertaining to statements made in Hi-Tech's supplement

16  facts panels.  *See, e.g.,* Woods Decl. ¶ 8, Ex. G (FDA warning letter, dated Apr. 22,

17  2015, concerning "misbranded" Hi-Tech products declaring an extract ingredient on

18  supplement facts panel without evidence it can be extracted as claimed on label);

19  Woods Decl. ¶ 9, Ex. H (FDA news release, dated Nov. 18, 2013, announcing seizure

20  by U.S. Marshals of $2 million in "illegal" Hi-Tech dietary supplements based on

21  ingredients disclosed in supplement facts panel); Woods Decl. ¶ 10, Ex. I (FDA

22  complaint for forfeiture, dated March 25, 2014, alleging that FDA's laboratory analysis

23  did not find presence of an ingredient in a product claimed to be in the product in its

24  supplement facts panel); Woods Decl. ¶ 11, Ex. J (FDA Recall Notice, dated June 20,

25  2003, announcing recall of Hi-Tech products containing the prescription drug

26  ingredient, Taldalafil, not declared in their supplement facts panel, that "poses health

27  risks when taken with certain prescription drugs containing nitrates"); Woods Decl. ¶

28  12, Ex. K (announcing recall, on June 15, 2009, of Hi-Tech's Stamina-Rx product for

-12-

containing the ingredient benzamidenafil, not approved by FDA and not declared on the product's supplement facts panel).

Moreover, nothing Mr. Wheat swears to with respect to his products could be taken as credible without the benefit of rigorous cross-examination, as public information reveals the following:

- Mr. Wheat was "convicted as a drug smuggler" twenty years ago for operating a "massive marijuana ring" and served time in prison for selling ecstasy.  *See* Woods Decl. ¶ 13, Ex. L (CNBC report, dated Sep. 4, 2014) and Woods Decl. ¶ 14, Ex. M (Affidavit of DEA Special Agent Edward Smith indicating arrest and imprisonment of Wheat in June 1990 for distributing ecstasy [¶ 34] and return to prison in around 1996 for marijuana trafficking [¶ 38]);

- Mr. Wheat was later sentenced to serve "over four years in federal prison and assessed a $3 million forfeiture for being the mastermind of a criminal scheme to manufacture and import adulterated and unauthorized pharmaceutical products, to include illegal knock-offs of Viagra, Ambien, Lipitor, Celebrex, Xanax, Vioxx, and Zoloft."  *See* Woods Decl. ¶ 15, Ex. N (U.S. Department of Justice Press Release, Feb. 3, 2009) (*see also* Woods Decl. ¶ 16, Ex. O (Criminal Indictment in U.S. v. Jared Robert Wheat, et al., Sep. 7, 2006)); and

- While serving time in prison, Mr. Wheat was found to have collaborated with his lawyer, Arthur Leach (the signatory on Hi-Tech's motion), in setting up a new bank account for Hi-Tech "in case the FTC tries to execute against our current bank account…" *See F.T.C. v. National Urological Group*, Civil Action No. 1:04-CV-3294, 2014 WL 3893796, *7 (N.D. Ga. May 14, 2014), reversed and remanded on other grounds, 785 F.3d 477 (11th Cir. 2015);

- Mr. Wheat failed to company with a recall order.  *See* Woods Decl. ¶

-13-

17, Ex. P (FTC news release, dated Sep. 8, 2014, announcing finding by federal judge in Atlanta that Mr. Wheat failed to comply with a previous court order requiring him to participate in a recall of certain products following a $40 million judgment obtained by FTC for false advertising); and

- Mr. Wheat lied about ceasing advertising as required by a federal court order. *See* Woods Decl. ¶ 18, Ex. Q (FTC's proposed findings of fact, dated March 10, 2014 [at ¶ 354], stating that "Wheat testified that he ceased advertising for all Hi-Tech products for the 18-months following entry of the Hi-Tech Order….Wheat's testimony was false.").

It is therefore no surprise that Hi-Tech sought to cherry pick its "evidence" on this motion, while shielding the Court from the "high dosages" types of claims as to arginine.   There is no reliable proof whatsoever that the products-at-issue did not infringe the patents, and the credibility of Hi-Tech and Mr. Wheat claiming otherwise should be seriously doubted by this Court.

## 2.    VPX's Infringing Products

VPX asserts that its "AEX NO product was discontinued in 2008."  Kesten Decl. at ¶ 6, ECF No. 246-17 at page 3 of 3.  This fact was never disclosed during discovery (which had not even commenced on the issue of infringement and damages), and whether or not that alleged fact would have withstood scrutiny during discovery is very much in question, as, at least until a few days before the submission of this brief, AEX NO remains listed for sale online. *See, e.g.*, Woods Decl. ¶ 19, Ex. R.  Nevertheless, this product was accused of infringing the '872 and '916 Patents, and VPX takes no issue with the infringement case against these two patents.  Thus, like Hi-Tech, VPX would have been litigating this case the same way through the end of the validity trial even if the '459 Patent was eventually found to not have been infringed.

With respect to the second product, NO Synthesize, VPX argues that the "label for NO Synthesize demonstrates that NO Synthesize contains neither L-arginine nor L-arginine hydrochloride," VPX's Br. at 5, but stops short of arguing anything about what form of arginine the product ***actually*** contains when administered.  *See also* Kesten Decl. at ¶ 3.  This is no mistake, because it is well known that "Di-L-Arginine Malate," which is what is claimed to be on NO Synthesize's label, is a salt in powder form, and such soluble salts dissociate when the powder product is mixed with liquid as instructed on the label – in this case, the dissociation would be into L-Arginine and Malic Acid. *See, e.g.,* "Dietary Supplements:  New Dietary Ingredient Notifications and Related Issues: Guidance for Industry" (FDA's Draft Guidance, Aug. 2016) at Section IV.B.4 (explaining that chemical bonds that form when soluble salts are created break the chemical bonds when salts are dissolved in water).  It thus seems disingenuous that VPX would provide the Court with only a part of the "label" – that is, the Supplement Facts panel.  *See* Kesten Decl. at ¶ 3 and Exhibit 1.  Without that key piece of evidence, VPX stops short of giving the actual instructions for the product appearing on the label – that is, "Mix one scoop….with 8 to 10 ounces of water or your favorite beverage." *See* Woods Decl. ¶ 20, Ex. S.  Because of this mixing, dissociation will occur as a matter of basic chemistry, so when the liquid is administered, the product ***actually*** contains L-Arginine, which is a fact VPX must know as it coyly skirts around the issue in its brief and its in-house counsel's declaration.  Like Hi-Tech, VPX's flawed logic is that Plaintiffs should not have relied on labels before filing suit, but Plaintiffs should have known from the labels there was no infringement – yet the exact opposite is true.

As to the NO Shotgun-branded products, VPX contends that the products "always contained less than 500 milligrams of L-arginine per serving" (Kesten Decl. at ¶¶ 4 and 5), but, tellingly, its in-house counsel's declaration does not actually say how many milligrams of L-arginine is ***actually*** contained in the products.[7]  The NO Shotgun

---

[7] VPX's counsel's statement in his brief that the NO Shotgun products "contained less than *5 milligrams* of L-arginine per serving" (VPX's Br. at 13, [emphasis in original]), cites to VPX's in-

Continued on the next page

-15-

products actually have three sources of arginine listed on the labels presented in VPX's motion: "L-Arginine," "L-Arginine Ethyl Ester DiHCL," and the same "Di-L-Arginine Malate" (or its equivalent, "Di-L-Arginine-L-Malate") as in NO Synthesize. And because NO Shotgun products are also powders to be mixed with liquid before consumption, the two arginine salts dissociate into L-Arginine. Thus, given the way VPX ignores that the two salts are sources of L-arginine when they are mixed with liquid as instructed, the reality is that there is much more L-arginine in NO Shotgun products, as administered, than VPX makes it seem.

Furthermore, it is evident from the NO Shotgun labels and advertising taken as a whole that, assuming they are accurate, the products actually contain much more than 500 milligrams of L-arginine per serving as administered. For example, in the label VPX presents for NO Shotgun MHF-1, "Di-L-Arginine-L-Malate" is listed third in an eleven ingredient blend containing 4.89 grams, and the last ingredient in that blend is "COP (Creatinol-O-Phosphate)." *See* Di Giovanni Decl. at Exh. 2. Because FDA regulations require ingredients in a blend to be listed in descending order of predominance by weight, every ingredient above COP in the blend must be present in the product at a weight greater than COP. 21 C.F.R. § 101.36(b)(2) and (c). In its advertising statements VPX does not present to the Court, VPX claims that COP "promote[s] anaerobic glycolysis." Woods Decl. ¶ 21, Ex. T. To support this claim, there should be an industry-standard minimum of 500 milligrams of COP per serving, as utilized in at least one of ***VPX's own products***. *See* Woods Decl. ¶ 22, Ex. U (VPX's mTORC1 product containing 500 milligrams per serving); *see also* Woods Decl. ¶ 23, Ex. V (labels and advertising for "Cardia Shred" supplement product containing 750 milligrams of COP per serving for "anaerobic glycolysis"); Woods Decl. ¶ 24, Ex. W (labels and advertising for "SNS Creatinol-O-Phosphate" supplement product

Continued from the previous page
house counsel's declaration, but the declaration does not state that fact at all. The statement should be disregarded. *See, e.g., Renta v. County of Cook*, 735 F. Supp. 2d 957, 964 (N.D. Ill. 2010) ("court may disregard factual assertions in briefing that are unsupported by citations to statements of fact").

containing 500 milligrams per serving of COP for "anaerobic glycolysis"); Woods Decl. ¶ 25, Ex. X (labels and advertising for "PrimaForce Creatinol-O-Phosphate" supplement product containing 2 grams of COP per serving for "anaerobic glycolysis"). Similarly, while the label for "NO-Shotgun V.3" presented by VPX, DiGiovanni Decl. at Ex. 3, lists COP two ingredients above "Di-L-Arginine Malate" in the 10,055 milligram blend, the label also reflects two other sources of L-Arginine – "L-Arginine" and "L-Arginine Ethyl Ester di-HCL" (another salt which would dissociate in water before consumption) – and VPX's advertising confidently calls out "Arginine (AEX)" as one of the ingredients that "can cause explosive muscle growth."  Woods Decl. ¶ 26, Ex. Y.  There is more than enough on the labels and advertising for VPX to reflect the presence of at least 500 milligrams of L-arginine in its products.

There is yet another reason why it is reasonable to assume that NO Shotgun-branded products contain more than a sufficient amount of arginine to enhance nitric oxide production, which stems from the published study VPX relies on in support of its marketing claims with respect to NO Shotgun.  *See* Woods Decl. ¶ 27, Ex. Z ("Effects of 28 days of resistance exercise and consuming a commercially available pre-workout supplement, NO-Shotgun, on body composition, muscle strength and mass, markers of satellite cell activation, and clinical safety markers in males," Shelmadine B. et al, J. Int. Soc. Sports Nutr. 2009; 6: 16), referred to in, for example, Woods Decl. ¶ 28, Ex. AA (advertising statements).   The study clearly indicates that "NO-Shotgun contains arginine, an alleged mediator of nitric oxide synthesis…."  Woods Decl. Ex. Z at 15; *see also id.* at 5 ("No Shotgun contains a proprietary blend of a number of compounds, but those assumed to target muscle strength and mass are creatine monohydrate, beta-alanine, ***arginine***, KIC, and leucine") [emphasis added].  As is the case with Hi-Tech, VPX cannot distance itself from the marketing claims it makes with respect to its products.[8]

---

[8] Like Hi-Tech, VPX has been recently warned by the FDA about selling "adulterated" supplements. *See* Woods Decl. ¶ 29, Ex. BB (Warning Letter of FDA to VPX's Jack Owoc, Apr. 24, 2015).

1    Based on the above, it is clear that Plaintiffs had more than a reasonable basis in

2    maintaining their infringement cases against Defendants - not only when they were filed

3    in 2013, but also in 2016.

4    **B.    Stanford and ThermoLife are Not "Patent Trolls" and Nothing About**
        **This Case was "Exceptional"**

5

6    Following their unsuccessful attack on the viability of Plaintiffs' infringement

7    case, both Defendants launch into a name-calling campaign alleging that Plaintiffs are

8    somehow "patent trolls," without clarifying what they mean by that term and how it is

9    relevant to this case.   Plaintiffs respectfully request the Court to not acknowledge

10   Defendants' use of this term, as it is clearly intended to be derogatory and pejorative.

11   *See, e.g., Finjan, Inc. v. Sophos, Inc.*, Case No. 14-cv-01197, 2016 WL 4560071, *8

12   (N.D. Cal. Aug. 22, 2016) (not allowing use of "patent troll" term); *Digital Reg of*

13   *Texas, LLC v. Adobe System, Inc.*, Case No. 12-1971, 2014 WL 4090550, *12 (N.D.

14   Cal. Aug. 19, 2014) (precluding use of "pejorative terms, such as 'patent troll'").   The

15   reason Defendants resort to such an outrageous term (whatever they mean by it) is clear

16   – they would like the Court to ignore that Stanford is the rightful owner of patents-in-

17   suit, and ThermoLife is a seller of finished products (Kramer Dep. at 31:18-19) and

18   ingredients (Kramer Dep. at 159:24-160:5).   *Contra* Hi-Tech's Br. (Dkt. 253-1) at 9.

19   Neither are, nor could ever be, "patent trolls."

20   Defendants baselessly argue that Plaintiffs' strategy was to "settl[e] with many

21   defendants for far less than litigation costs" and "extract the maximum amount of

22   settlement money from the defendants."  *See* Hi-Tech's Br. at 10 (ECF No. 253-1 at 13

23   of 16).   For instance, Hi-Tech hypothesizes that ThermoLife may have generated "two

24   million dollars" in recoveries.  *See* VPX's Br. at 7 and Hi-Tech's Br. at 10 (ECF No.

25   253-1 at 13 of 16).   Defendants' guesses and hypotheses are not only unsupported by

26   any evidence, but they are flatly incorrect.[9]  Defendants fail to discuss or reveal actual

---

27   [9] Equally wrong, and almost laughable, is the completely unsupported assertion that Plaintiffs "filed
     suit against the better part of the dietary supplement industry" in this action.  Hi-Tech's Br. at 10 (ECF
28   No. 253-1 at 13 of 16).

1   details about these settlements, for example:  what ThermoLife's costs were associated

2   with the exclusive license; what the sales at issue were for each settling defendant; on

3   what terms the cases settled; what ThermoLife paid to Stanford and the inventors for

4   each settlement; what ThermoLife's litigation costs were; what each settling

5   defendant's litigation costs were; how much the cases settled for, particularly as the

6   invalidity trial neared; and what amount ThermoLife actually generated, particularly as

7   compared to the lawyers' fees Hi-Tech and VPX seem to have spent.[10]

8          Defendants repeatedly reference the "more than 80 supplement companies" that

9   were involved in the consolidated case, Hi-Tech's Br. at 10 (ECF No. 253-1 at 13 of

10  16), but the number of defendants in a consolidated case is irrelevant for an

11  "exceptional case" analysis.  *See, e.g., GoDaddy.com LLC v. RPost Communications*

12  *Limited*, No. CV-14-00126, 2016 WL 4569122, *9 (D. Ariz. Sep. 1, 2016) ("the Court

13  cannot conclude that an award of over $1,000,000.00 in attorneys' fees is warranted

14  based solely on RPost's pre-litigation conduct with non-parties. Although sending over

15  550 'patent infringement demand letters' within such a short period of time certainly

16  appears to be the prototypical example of 'trolling,' the fact of the matter is that RPost

17  owns the Asserted Patents and therefore owns the right of enforcement.  Enforcement of

18  a patent against one company or a thousand companies is, legally speaking, the same.").

19  Not one of the other District Court cases cited by Defendants, VPX's Br. at 15-16 and

20  Hi-Tech's Br. (ECF No. 253-1) at 10, are relevant; rather, the relevant District Court

21  cases with similar facts have dismissed the arguments put forth by Defendants.  *See,*

22  *e.g., Digitech Image Technologies, LLC v. Newegg, Inc.*, Case No. 8:12-cv-01688, 2013

23

---

24  [10] VPX's counsel asserts that ThermoLife "refused to unconditionally dismiss" VPX from the suit
     (DiGiovanni Decl. ¶ 2), but fails to mention that the dismissal that VPX sought was one that included

25  not only a covenant not to sue VPX but also a payment of VPX's attorneys' fees.  In any event,
     comparing VPX's "estimate" of its legal fees - $370,000 (Kesten Decl. at ¶ 2) - with the nearly $1

26  Million sought by Hi-Tech for its three lawyers and patent agent (Hi-Tech's Br. at 11 [ECF 253-1 at
     14 of 16]) calls into question the reasonableness of the fees allegedly billed and paid by Hi-Tech, as

27  well as the whole notion of generalizing litigation costs for each defendant in this case.  *Cf.* VPX's Br.
     at 16 ("settlements were each for far less than the cost of litigating this case").  To the extent the Court

28  is inclined to consider these fees, Plaintiffs respectfully request that the relevant bills, which have not
     been provided, should be scrutinized in detail.

WL 5604283, *5 (C.D. Cal. Oct. 11, 2013) ("The Court is not persuaded by Newegg's rote attempt to shift the burden of paying legal fees by hurling Digitech into the crusade against 'Patent Trolls.' A party seeking protection of constitutionally granted patent rights is not automatically the villain simply because it brings infringement allegations against multiple defendants."); *GeoTag, Inc. v. Zoosk, Inc.*, Case No. C-13-0217, 2014 WL 793526, *2 (N.D. Cal. Feb. 26, 2014) ("that GeoTag may be a serial litigant does not mean (or even imply) that its claims are inherently brought in bad faith or without merit"); *IPVX Patent Holdings, Inc. v. Voxernet, LLC*, Case No. 5:13-cv-01708, 2014 WL 2772297, *2 (N.D. Cal. June 18, 2014) (same).

Defendants' cases from the Federal Circuit discussing so-called non-practicing entities' litigation conduct as "exceptional" support a finding of non-exceptionality.  In *SFA Sys., LLC v. Newegg, Inc.*, 793 F.3d 1344, 1349 (Fed. Cir. 2015) (cited in VPX's Br. at 14 and Hi-Tech's Br. at 10 [ECF No. 253-1 at 13 of 16]), the Federal Circuit found there was no exceptional conduct by the patentee, even though the patentee briskly dismissed its claims "once it was faced with the prospect of a trial in which the merits of its claims would be tested."  Here, it is clear that Plaintiffs have always been interested in testing the merits of their claims, not just collecting settlements – evident, of course, in the fact that the Plaintiffs took their validity case all the way to trial. Moreover, in *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011) (VPX's Br. at 14 and Hi-Tech's Br. at 10 [ECF No. 253-1 at 13 of 16]), the case was declared an "exceptional case" only because the patentee and one of the inventors engaged in a myriad of litigation abuses such as destroying relevant documents, failing to engage in claim construction in good faith, displaying a "lack of regard for the judicial system," had a "cavalier attitude" toward the litigation process, and maintaining an infringement case that was "objective baseless."  *Eon-Net*, 653 F.3d at 1327.  None of these facts exist here.  This is not a case that "stands out" as required by *Octane Fitness*.

1

### III.  CONCLUSION

2      For the reasons set forth above, Plaintiffs respectfully request that the Court deny

3   Defendants' motions for attorneys' fees.

4

5                                        Respectfully submitted,

6

7   Dated:  November 17, 2016            NEWPORT TRIAL GROUP

8                                        By: /s/  Tyler J. Woods
                                             Tyler J. Woods
9                                            *Attorneys for Plaintiffs*

10                                           *The Board of Trustees of the Leland*
                                             *Stanford Junior University*
11                                                      - and -
                                             *ThermoLife International, LLC*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR ATTORNEYS' FEES          13-cv-651 JLS (MDD)

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on November 17, 2016, I electronically filed the foregoing

3  **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE MOTION FOR**

4  **ATTORNEYS' FEES OF DEFENDANTS VITAL PHARMACEUTICALS, INC.**

5  **AND HI-TECH PHARMACEUTICALS, INC.** with the Clerk of the Court using the

6  CM/ECF system which will send notification of such filing via electronic mail to all

7  counsel of record.

8

9                        */s/Tyler J. Woods*
                         Tyler J. Woods

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE
PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR ATTORNEYS' FEES       13-cv-651 JLS (MDD)